THE STATE OF OHIO, APPELLEE, *v.* ELMORE, APPELLANT.

[Cite as *State v. Elmore,* 111 Ohio St.3d 515, 2006-Ohio-6207.]

(No. 2004–0041—Submitted August 8, 2006—Decided December 13, 2006.)

LUNDBERG STRATTON, J.

{¶ 1} In this appeal, defendant-appellant, Phillip E. Elmore, raises 17 propositions of law. We find one proposition to be meritorious and remand the case to the trial court to resentence Elmore on the noncapital offenses for which he was convicted. We find that none of his other propositions of law has merit and affirm Elmore's convictions. We have also independently weighed the aggravating circumstances against the mitigating factors and have compared Elmore's sentence of death to those imposed in similar cases, as R.C. 2929.05(A) requires. We find that the sentence of death imposed in this case was appropriate, and we therefore affirm it.

{¶ 2} On June 1, 2002, 47–year–old Pamela Annarino attended her son's wedding ceremony and reception. While Annarino was attending these activities, Elmore broke into her Newark home and waited for her to return. Elmore and Annarino had previously had a personal relationship.

{¶ 3} After she arrived home, Elmore murdered Annarino by strangling her and hitting her in the head with a pipe. Elmore then stole Annarino's purse and fled in her car. Subsequently, Elmore was convicted of the aggravated murder of Annarino and sentenced to death.

516

{¶ 4} Around 9:30 a.m. on June 1, 2002, Annarino left her home on West Postal Avenue in Newark to attend her son's wedding. Annarino and her sister, Janna Wilfong, drove to the wedding in Wilfong's car. Around 10:00 a.m. or 11:00 a.m., Timothy Grooms, a friend of Annarino, went to her house to look after Annarino's dog while she was at the wedding. However, Grooms could not get into the house because he could not find the house key where Annarino was supposed to have left it.

{¶ 5} At 12:30 p.m., Annarino arrived home from the wedding and went into her house. Shortly thereafter, Annarino drove her Toyota Camry to the wedding reception.

{¶ 6} During the late afternoon on June 1, Annarino arrived home. Gloria Cooperider, Annarino's next-door neighbor, saw Annarino exit her car and walk toward the back door of her house. "Very shortly thereafter," Cooperider saw Elmore "get in [Annarino's] car, start it up and pull away." Cooperider recognized Elmore because she had met him approximately two years earlier when Elmore and Annarino were dating.

{¶ 7} Around 5:00 p.m. or 6:00 p.m. on June 1, John Williams, who lived with Cooperider, was returning to their home on West Postal Avenue. As Williams turned onto West Postal Avenue, he saw Elmore driving Annarino's car. Williams waved at Elmore, and Elmore "[k]ind of smiled" and waved back, according to Williams.

{¶ 8} On June 2 and 3, Grooms returned to Annarino's home, but he still had no key to the house, and he left after concluding that Annarino was not there. On June 4, Grooms and Clifton Rodeniser, Annarino's brother-in-law, went to Annarino's home to check on her. They found the front and back doors locked, but Grooms pried open a window, and they entered the house. After an extensive search of the home, Grooms and Rodeniser found Annarino's body in a bathtub in the second-floor bathroom. Rodeniser then notified the police by calling 911.

{¶ 9} Around 7:15 p.m. on June 4, police arrived at Annarino's home. Annarino's body was covered in blood. A paramedic testified at Elmore's trial that Annarino "had a large laceration over the right side of her skull above the eye approximately three to four inches in length with bone fragments sticking out." A pair of elastic leggings was tied around her neck.

{¶ 10} Police investigators found blood spatters on the ceiling, the tub, and the wall area behind the tub. According to Timothy Elliget, a Newark police criminalist, "blood spatter on the ceiling area above the tub * * * was consistent with castoff from a weapon." Elliget testified that blood spatters also "came out

in a V pattern from the head and deposited on * * * the wall surrounding the back of the tub" and that the spatter pattern "was consistent with * * * an object striking the victim's head in that area." Finally, the absence of blood spatters at the end of the bathtub created a "void pattern" that led Elliget to conclude that Annarino was in the bathtub when the attack occurred.

{¶ 11} Investigators found evidence that the back door had been forced open. The inside edge of the door near the door lock had been damaged, and pry marks were visible on the door as well. The lock plate was also missing. Newark police officers found three fingerprints on the back door, and Officer Elliget testified that those prints were a match to Elmore's "left ring finger, the left middle finger and the left index finger." Police officers also found a shotgun and a shell underneath Annarino's bed.

{¶ 12} The garage behind the house was also searched by the officers, who found shoe prints on the garage floor and on a piece of paper inside the garage. A shoe print from the garage and a shoe print from the shoes that Elmore was wearing at the time of his arrest were later compared. According to Elliget, the shoe print from the garage and Elmore's shoe print "are of a similar pattern."

{¶ 13} On June 5, Dr. Charles Lee, a Deputy Coroner for Licking County, conducted the autopsy on Annarino. The victim had several lacerations on the top of her head caused by "four to five" blows from a blunt instrument. Dr. Lee found that the "multiple blunt force injuries to the head" were the cause of Annarino's death. He also determined that Annarino had been strangled with the leggings that were found around her neck. Strangulation could have easily rendered Annarino unconscious, and it was a contributing factor in her death, according to Dr. Lee. Finally, Dr. Lee testified that lacerations on Annarino's left forearm were defensive wounds caused by a blunt instrument before Annarino was killed.

{¶ 14} After speaking with Annarino's neighbors on the evening of June 4, the police determined that Elmore was their primary suspect, and they broadcast his name and the description of Annarino's Toyota Camry to other law-enforcement agencies. Around 4:00 a.m. on June 5, a Columbus police officer, Shea McCracken, spotted Annarino's Toyota Camry in Columbus and followed the car into a parking lot. The two occupants of the car exited the vehicle, and they were identified as Scott Darthard and Shawnta Hale.

{¶ 15} Based upon information received from Darthard and Hale, Columbus police officers conducted a stakeout of Hale's home in Columbus. During the early morning hours of June 5, police officers saw Elmore leave Hale's home and walk down the street. They then arrested Elmore and transported him to the headquarters of the Columbus Police Department.

{¶ 16} Around 7:00 a.m. on June 5, Newark Detectives Steven Vanoy and Steven Baum interviewed Elmore. After being advised of his *Miranda* rights and waiving those rights, Elmore admitted going to Annarino's home on June 1. He also told the detectives that he and Annarino had argued that day, and he acknowledged that he had taken Annarino's car. According to Detective Vanoy, Elmore then said, "I did it. I'm guilty. That's it." Later that morning, Elmore was transported to the Newark Police Department.

{¶ 17} At around 10:00 a.m. on June 5, Elmore informed Detective Vanoy that he wanted to talk further. After again waiving his *Miranda* rights, Elmore provided a detailed confession to Annarino's murder. Detectives Vanoy and Baum recorded Elmore's statement on audiotape. Elmore stated that around 6:00 a.m. on June 1, he went to Annarino's house and "stayed in the garage until she left." He then broke into the house by prying open the back door with a screwdriver. Elmore went to the upstairs bedroom and found the shotgun that Annarino had kept under her bed. He then took the shotgun to the downstairs kitchen.

{¶ 18} According to Elmore, after Annarino arrived home from the wedding reception, they sat in the kitchen, talked, and argued. Elmore held the shotgun while he was talking to her. During their argument, Elmore gave Annarino the shotgun and told her "if you want to kill me you can kill me." Elmore explained to the detectives that he had taken the shells out of the shotgun, but it is unclear whether Annarino knew that the gun was unloaded. Annarino then went to her upstairs bedroom to change clothes. She took the shotgun with her. Elmore followed Annarino, and they continued to argue upstairs.

{¶ 19} While they were in the upstairs bathroom, Annarino "just went off on [him]," according to Elmore. He said, "She just got in my face and started * * * screaming and stuff." Elmore told Annarino, "I'm gonna get outta here. * * * [Y]ou go where you have to go and I'm gonna leave. * * * [B]ut let me tie you up before you get a chance to call the police."

{¶ 20} According to Elmore, they continued to argue. At some point, Elmore went downstairs, picked up a lead pipe that he had brought into the house when he broke in, and returned to the upstairs bathroom. He then "hit her in the arm and she fell back in the tub." Elmore explained to the detectives, "It's like I just blacked out * * * [and] I hit her again * * * three or four times" on her head.

{¶ 21} Then, according to Elmore, he went downstairs, "grabbed her purse, locked the door * * * got in the car and * * * left." He went to a friend's house, changed his pants, and drove Annarino's car to Columbus. He said that he put the pipe and Annarino's purse into a bag and threw the bag into a dumpster in Columbus.

{¶ 22} Elmore told the detectives, "[I] just wanted to scare [Annarino]. * * * I didn't want to hurt her at all." He denied tying the leggings around her neck, explaining instead that he had put them "around her mouth."

{¶ 23} On June 6, Elmore was questioned again by the detectives. After waiving his *Miranda* rights for a third time, Elmore continued to deny that he had strangled Annarino. However, Elmore recalled that he had tied her hands with a "yellow floral pattern" dress or shirt. He added that he had untied her hands when she complained that they were bound too tightly.

{¶ 24} On June 14, Detective Baum interviewed Elmore again. After waiving his *Miranda* rights, Elmore said that he had remembered additional details of the crime, including "choking [Annarino] before [he] hit her." He added, "I didn't choke her with the stretch pants. I choked her with my hands."

{¶ 25} The police never found the lead pipe, Annarino's stolen purse, or the yellow floral-patterned dress or shirt. They did, however, recover the blood-stained shorts that Elmore was wearing on the day of the murder. A key and a lock-plate cover were found in the shorts pocket. Investigators found that the key operated the deadbolt lock on Annarino's back door. The lock plate also fit into the door panel and was the same brand as the deadbolt lock.

{¶ 26} Jennifer Duvall, a DNA analyst at the Ohio Bureau of Criminal Identification and Investigation, conducted DNA tests on the bloodstain found on Elmore's shorts. Testing revealed that DNA from the bloodstain on the shorts was consistent with Annarino's DNA. According to Duvall, the chance of finding this same DNA profile in a random member of the population "would be one in over five quadrillion in the Caucasian population, one in over six quadrillion in the African–American population, and one in more than 14 quadrillion in the Hispanic population."

{¶ 27} At Elmore's trial, the defense introduced a laboratory report showing that the shotgun found under the victim's bed was fully functional. The defense presented no further evidence until the penalty phase of the trial.

### Case history

{¶ 28} The grand jury in Licking County indicted Elmore on one count of aggravated murder. That first count in the indictment alleged that Elmore committed the aggravated murder of Annarino while also committing kidnapping, aggravated robbery, or aggravated burglary. Appended to Count 1 were four death-penalty specifications: murder for the purpose of escaping apprehension or detection, R.C. 2929.04(A)(3); murder while committing, attempting to commit, or fleeing after committing kidnapping, R.C. 2929.04(A)(7); murder while committing, attempting to commit, or fleeing after committing aggravated robbery, R.C.

2929.04(A)(7); and murder while committing, attempting to commit, or fleeing after committing aggravated burglary, R.C. 2929.04(A)(7).

{¶ 29} Elmore was also charged with five noncapital offenses: Count 2 charged Elmore with murder, Count 3 charged kidnapping, Count 4 charged aggravated robbery, Count 5 charged aggravated burglary, and Count 6 charged grand theft for taking Annarino's Toyota Camry.

{¶ 30} Elmore pleaded not guilty to the indictment. At trial, the jury found Elmore guilty of all charges, and he was sentenced to death.

{¶ 31} Elmore now appeals to this court as a matter of right.

### Pretrial and guilt-phase issues

{¶ 32} *Motion to suppress.* In proposition of law XV, Elmore argues that he was improperly arrested without a warrant on the morning of June 5, 2002. Elmore claims that his subsequent statements to the police were the fruits of his improper arrest and should not have been introduced at trial. See *Brown v. Illinois* (1975), 422 U.S. 590, 603–605, 95 S.Ct. 2254, 45 L.Ed.2d 416.

{¶ 33} During the pretrial hearing on Elmore's motion to suppress, Detective Vanoy testified that neighbors had seen Elmore drive off in Annarino's car around the time she was thought to have been killed. During the early morning hours of June 5, 2002, the Newark police sent a broadcast to other law-enforcement agencies indicating that Elmore was wanted in connection with the homicide of Pamela Annarino. The broadcast included a description of Elmore and information about Annarino's Toyota Camry.

{¶ 34} Around 4:00 a.m. on June 5, Columbus police officer Shea McCracken saw Annarino's car drive past him. He confirmed that this was Annarino's car by checking the license plate number on his on-board computer. McCracken also called a nearby patrolman, who verified that the Newark police were looking for this vehicle as part of a homicide investigation. Officer McCracken then signaled the driver of the Toyota Camry to stop, and he determined that the occupants of the car were Scott Darthard and Shawnta Hale.

{¶ 35} Columbus police officer Eric Everhart testified at the suppression hearing that he talked with Darthard and Hale on the morning of June 5. Officer Everhart had known Darthard for more than five years and had had frequent contact with him. Darthard had provided him with reliable information on several occasions. Darthard told Everhart that he had gotten the vehicle from a crack cocaine user and described him as an older, short, black male. Darthard was supposed to return the vehicle to that person at 7:00 a.m. at Oak and Morrison Streets in Columbus.

{¶ 36} Based upon Darthard's information, several police officers conducted a stakeout of Hale's home near the corner of Oak and Morrison. Around 6:00 a.m.,

a man matching Elmore's description was observed exiting Hale's home. Elmore started walking toward Everhart's location, and when Elmore saw the police, he did an about-face and started walking in the other direction. Officer Brett Bodell approached Elmore and asked, "Hey, bub, what's your name?" After identifying himself, Elmore was placed in handcuffs and searched, but nothing was found. Elmore was then taken into custody.

{¶ 37} Elmore contends that his warrantless arrest violated the Fourth Amendment. Elmore claims that once he identified himself, answered the officer's questions, and was patted down, a procedure that revealed nothing suspicious, the police were required to let him go. We reject this argument.

{¶ 38} The warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment. See *United States v. Watson* (1976), 423 U.S. 411, 423–424, 96 S.Ct. 820, 46 L.Ed.2d 598; *United States v. Santana* (1976), 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300. Moreover, in Ohio, warrantless arrests are permitted by statute. R.C. 2935.04 provides: "When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained." Thus, the question becomes whether there was probable cause for making the arrest.

{¶ 39} Probable cause for a warrantless arrest requires that the arresting officer, at the time of the arrest, possess sufficient information that would cause a reasonable and prudent person to believe that a criminal offense has been or is being committed. *Gerstein v. Pugh* (1975), 420 U.S. 103, 111–112, 95 S.Ct. 854, 43 L.Ed.2d 54; *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142. In determining whether probable cause existed, we examine the "totality" of facts and circumstances surrounding the arrest. See *State v. Homan* (2000), 89 Ohio St.3d 421, 427, 732 N.E.2d 952.

{¶ 40} Before his arrest, police knew that Elmore had been identified leaving Annarino's home shortly after she was killed and that he had driven off in her car. Police later stopped Annarino's car in Columbus. The driver, who was known as a reliable informant, provided the police with a detailed description of the person who had loaned him the car. The driver also told the police where and when they could find this person. The police then went to the corner of Oak and Morrison and observed a man who matched the description walking down the street. When Officer Bodell approached him, Elmore immediately identified himself. Based upon the totality of these circumstances, we hold that the police had probable cause to arrest Elmore.

{¶ 41} Thus, we hold that Elmore was properly arrested, and proposition XV is overruled.

{¶ 42} *Sufficiency and manifest weight of the evidence.* In proposition of law VI, Elmore challenges the sufficiency of the evidence to support the kidnapping specification, R.C. 2929.04(A)(7), and the underlying kidnapping charge, R.C. 2905.01. In proposition of law II, Elmore contends that the kidnapping charge and the kidnapping specification are not supported by the manifest weight of the evidence.

{¶ 43} In reviewing a claim of insufficient evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 44} A claim that a jury verdict is against the manifest weight of the evidence involves a separate and distinct test. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 45} During the penalty phase, the trial court merged Specification 1 (murder to escape apprehension) and Specification 2 (kidnapping) into separate Specification 3 (aggravated robbery) and Specification 4 (aggravated burglary). The jury was therefore instructed to consider only the latter two specifications during the penalty phase of the trial. In ruling that the jury should not consider the kidnapping to be an aggravating circumstance in the penalty phase, the trial court explained (outside the presence of the jury):

{¶ 46} "[T]he Kidnapping specification is part and parcel of the offenses of Aggravated Murder, Aggravated Robbery and Aggravated Burglary and * * * the defendant lacked a separate animus to commit the Kidnapping offense. The kidnapping did not involve a substantial transportation of the victim to a location different than that where the Aggravated Murder, Aggravated Burglary or Aggravated Robbery occurred and did not involve a substantial restraint of the victim's freedom separate and distinct from the offenses of Aggravated Murder, Aggravated Robbery and Aggravated Burglary."

{¶ 47} Nonetheless, the trial court sentenced Elmore to ten years on Count 3, the separate kidnapping charge. Thus, the trial court never found that its reasoning relating to the specifications affected the separate kidnapping offense.

Because the kidnapping specification was merged into other specifications, the underlying kidnapping charge is the basis for this challenge.

{¶ 48} For a kidnapping conviction to be upheld, "there must be significant restraint or movement, not just that incident to the killing itself." *State v. Cook* (1992), 65 Ohio St.3d 516, 524, 605 N.E.2d 70. Elmore argues that there was no movement to support the kidnapping charge, because Annarino was not moved from the bathroom before she was killed. He also asserts that there was insufficient evidence of restraint and that the leggings around her neck were "incidental to the act of murder [but do] not support a kidnapping."

{¶ 49} The record refutes Elmore's claim. During his police statement on June 6, 2002, Elmore admitted that he had tied Annarino's hands before killing her. He later untied her hands when she complained that they were bound too tightly. Thus, Elmore restrained Annarino for some period of time before murdering her. We have affirmed a kidnapping conviction in similar circumstances. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 280–281, 754 N.E.2d 1150 (victim restrained by being tied to her bed and gagged before she was murdered); cf. *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 93 (kidnapping charge dismissed because the murder victim was neither restrained nor moved from the room where she was killed). Therefore, we hold that there was sufficient evidence to prove kidnapping in Count 3, and we overrule proposition VI.

{¶ 50} As to Elmore's manifest-weight challenge, Elmore reiterates that there was no evidence of asportation or restraint to support his conviction for kidnapping. As discussed, Elmore tied Annarino's hands before killing her. Accordingly, after carefully reviewing the record and weighing the evidence, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice in convicting Elmore of the separate offense of kidnapping. Thus, we reject proposition II.

{¶ 51} *Allied offenses.* In proposition of law III, Elmore argues that aggravated murder and kidnapping are allied offenses of similar import and, therefore, he cannot be convicted of both crimes. R.C. 2941.25(A) provides: "Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment * * * may contain counts for all such offenses, but the defendant may be convicted of only one." This court has repeatedly held that aggravated murder and kidnapping are not allied offenses of similar import under R.C. 2941.25. See *State v. Coley* (2001), 93 Ohio St.3d 253, 265, 754 N.E.2d 1129; *State v. Keenan* (1998), 81 Ohio St.3d 133, 154, 689 N.E.2d 929; *State v. Jells* (1990), 53 Ohio St.3d 22, 32–33, 559 N.E.2d 464. Thus, we reject proposition III.

{¶ 52} In proposition of law VIII, Elmore argues that he was improperly convicted of and sentenced for aggravated robbery and grand theft because the two crimes constitute allied offenses of similar import. However, the defense failed to raise this issue at trial and thus waived all but plain error. See *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; *State v. Comen* (1990), 50 Ohio St.3d 206, 211, 553 N.E.2d 640.

{¶ 53} Aggravated robbery and theft may constitute allied offenses of similar import under R.C. 2941.25(A). See *State v. Parson* (1983), 6 Ohio St.3d 442, 446, 6 OBR 485, 453 N.E.2d 689; *State v. Johnson* (1983), 6 Ohio St.3d 420, 6 OBR 466, 453 N.E.2d 595, paragraph one of the syllabus. However, further analysis is necessary. R.C. 2941.25(B) provides, "Where the defendant's conduct * * * results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment * * * may contain counts for all such offenses, and the defendant may be convicted of all of them." Thus, Elmore's conduct must be reviewed to determine whether the offenses were committed separately or with a separate animus as to each.

{¶ 54} Elmore committed aggravated robbery as charged in Count 4 by taking Annarino's purse after he killed her. He committed grand theft as charged in Count 6 *after he left the house* and drove off in Annarino's car. Thus, Elmore's theft of Annarino's purse was committed separately from his theft of her car. See *State v. Houseman* (1990), 70 Ohio App.3d 499, 509, 591 N.E.2d 405 (aggravated robbery of car keys and an antique gun inside the house committed separately from the theft of the victim's car); *State v. Reyna* (1985), 24 Ohio App.3d 79, 82, 24 OBR 148, 493 N.E.2d 555 (aggravated robbery of money inside the house committed separately from the theft of the victim's car). Accordingly, we overrule proposition VIII.

{¶ 55} ***Ineffective assistance of counsel.*** In proposition of law XIII, Elmore argues that he received ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 56} Elmore argues that his counsel's performance was ineffective because the lawyers conceded during closing arguments in the guilt phase of the trial that Elmore was guilty of kidnapping after those lawyers had made an earlier, unsuccessful motion for an acquittal on the kidnapping charge and specification. Elmore contends that counsel were deficient by presenting "inconsistent theories on outcome determinative matters."

{¶ 57} At the conclusion of the state's case, the defense moved for an acquittal on the kidnapping charge and the kidnapping specification. See Crim.R. 29(A). The defense, citing *State v. Logan* (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, argued that the state did not prove that the kidnapping was committed with a separate animus from the underlying murder. The trial court denied this motion.

{¶ 58} During final trial-phase arguments, the defense focused on convincing the jury that Elmore was guilty of murder rather than aggravated murder. Trial counsel argued: "And we maintain that * * * you'll not find Phillip Elmore innocent, but you will find him not guilty of aggravated murder, and you should find him guilty of murder, and that's what we're asking you to do. Phillip Elmore committed a burglary, he committed a kidnapping, he committed a robbery, he committed a theft of a motor vehicle, and he committed a murder. He did not commit aggravated murder."

{¶ 59} Trial counsel's motion for acquittal on the kidnapping charge and specification and his final argument acknowledging that a kidnapping had occurred were not inconsistent. Trial counsel's motion for acquittal was based upon a legal argument about the alleged inseparability of the animus underlying the murder and the kidnapping. In making this argument, trial counsel did not argue that the elements of kidnapping had not been proven. Moreover, counsel's legal argument was presented to the trial court, and the final argument was presented to the jury.

{¶ 60} Trial counsel's tactical decision to concede Elmore's guilt on the kidnapping charge maintained defense credibility and allowed the defense to focus the jury's attention on defense counsel's argument that Elmore was guilty of murder rather than aggravated murder. Cf. *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 60–61. As his closing argument shows, trial counsel argued vigorously for the jury to find Elmore guilty only of murder and not aggravated murder. Had Elmore succeeded in obtaining an acquittal on the aggravated-murder charge, he would have been ineligible for the death penalty. Thus, we reject this ineffectiveness claim.

{¶ 61} Furthermore, given the overwhelming evidence of Elmore's guilt, even if counsel's performance had been deficient, Elmore was not prejudiced. Moreover, the kidnapping specification was merged before sentencing. Thus, defense counsel's efforts on the kidnapping issue did not affect the penalty phase. Accordingly, we reject proposition XIII.

{¶ 62} *Prosecutor's closing argument.* In proposition of law IV, Elmore argues that the prosecutor committed misconduct by referring to facts outside the record during the guilt-phase closing argument. "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper

and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.

{¶ 63} Elmore attacks the following segment of the prosecutor's rebuttal argument: "What happened, we submit to you, a reasonable theory is that Pam Annarino didn't know that [the back] door had been forced open, and she goes inside. She does not sit down at the kitchen table and talk. Instead, she does what I suspect many women would do who have been dressed in relatively formal clothes since 8:00 that morning, she walks upstairs and she changes her clothes. Do any of you believe for one minute that that woman would have walked upstairs, let alone changed clothes, knowing that Phillip Elmore is in the house? Of course, not.

{¶ 64} "And we submit * * * that when she was upstairs, Phillip Elmore comes upstairs and he surprises her. You want to know why that knot's in the back? Because we submit he came up behind her with those pants and put them around her neck, and that's the beginning of the kidnapping. And we submit to you that that defendant, for however long he had been in the house, was sitting there getting, as he said, mad, mad and madder. You want to know why? Because he had been rejected by Pam Annarino and his ego is more important—." Defense counsel objected at that point on the ground that the argument assumed facts not in evidence, but the objection was overruled.

{¶ 65} Elmore argues that the prosecutor made an unsupported accusation in asserting that Annarino would not have gone upstairs if she had known that he was in the house. Elmore also claims that the prosecutor improperly argued that he had sneaked up behind Annarino and choked her. According to Elmore, the prosecutor's improper comments led the jury to find that he purposely killed Annarino.

{¶ 66} The defense, however, opened the door to the prosecutor's rebuttal argument. During the defense argument, trial counsel argued that Elmore had gone to Annarino's house to talk to her but had not intended to hurt her. Trial counsel claimed that "[i]f it was [Elmore's] specific intent to cause her death, why upstairs? Why not in the kitchen when she comes in the door where he has the crow bar, the pipe and the screwdriver? * * * It doesn't make sense. What makes sense is what Mr. Elmore tells us happened: An argument escalates to the point where he snaps, where he loses it, and where he does a terrible thing."

{¶ 67} The prosecutor's rebuttal then refuted these defense claims. Moreover, "[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *State v. Smith* (1997), 80 Ohio St.3d 89, 111, 684 N.E.2d 668. The prosecutor's argument—that Elmore surprised Annarino after she went upstairs and that he strangled her from behind—represented fair comment based on reasonable inferences that

could be drawn from the evidence. Argument that Elmore waited in the house for Annarino to arrive home and got "mad and madder" because she had "rejected" him was also fair comment.

{¶ 68} We find that the prosecutor committed no misconduct in making his rebuttal argument. Thus, proposition IV is overruled.

{¶ 69} *Instructions.* In proposition of law V, Elmore argues that the instructions improperly defined aggravated burglary as a theft offense.

{¶ 70} Over defense objection, the trial court provided the following instructions on the aggravated-robbery charge:

{¶ 71} "Fourth Count. The Defendant is charged with aggravated robbery. Before you can find the Defendant guilty, you must find beyond a reasonable doubt that on or about the 1st day of June, 2002, and in Licking County, Ohio, the Defendant, while committing or attempting to commit or fleeing immediately after committing or attempting to commit a *theft offense,* had a deadly weapon, a pipe or other blunt object, on or about his person or under his control and displayed the weapon, brandished it, indicated that he possessed it, or used the weapon.

{¶ 72} " * * *

{¶ 73} "Underlying Theft Offense. Theft is defined as knowingly obtaining or exerting control over the property of another without the consent of the owner or with purpose to deprive the owner of said property. *You are further instructed that Aggravate[d] Burglary is defined as a theft offense under* Ohio law." (Emphasis added.)

{¶ 74} First, Elmore claims that the trial court erred by instructing that aggravated burglary is a theft offense. However, this argument lacks merit. R.C. 2913.01(K)(1) defines a theft offense to include "[a] violation of section * * * 2911.11 * * * of the Revised Code." That latter provision defines the crime of aggravated burglary. Moreover, the intent of the General Assembly concerning the definition of a theft offense is reflected in the Legislative Service Commission's 1973 comment on R.C. 2913.01:

{¶ 75} " 'Theft offense' is broadly defined to include not only a series of specific offenses contained in the new code, but also to include any felony or misdemeanor, under state or federal law or municipal ordinance, of which robbery, *burglary,* breaking and entering, theft, conversion, embezzlement, fraud, forgery, counterfeiting, or similar act is an element * * *." (Emphasis added.) Thus, there was no error, because the trial court's instruction was a correct statement of the law.

{¶ 76} Second, Elmore argues that the instruction defining aggravated burglary as a theft offense relieved the state of its burden to prove that an underlying theft offense had been committed. We also reject this argument. The trial

court's instruction simply supplied the *definition* of a theft offense. These instructions conveyed no findings that aggravated burglary had been committed. See *State v. Nelson* (June 15, 1983), Summit App. Nos. 10973, 10975, 10993, and 10999, 1983 WL 4137, at *5 (instruction defining breaking and entering as a "theft offense" was proper).

{¶ 77} Finally, Elmore's reliance on *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39, is misplaced. *Sandstrom* held that a jury instruction that shifts to the defendant the burden of proof on an element of the crime at issue violates due process. *Sandstrom* is not implicated here, because the trial court's definition of theft did not supply a missing element of the state's proof and did not shift any burden to the defendant.

{¶ 78} Based on the foregoing, proposition V is overruled.

{¶ 79} In proposition of law XIV, Elmore argues that the trial court erred by refusing the defense request for an instruction on voluntary manslaughter.

{¶ 80} R.C. 2903.03(A), which defines "voluntary manslaughter," provides: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another * * *." Voluntary manslaughter is considered an inferior-degree offense to aggravated murder. See *State v. Benge* (1996), 75 Ohio St.3d 136, 140, 661 N.E.2d 1019.

{¶ 81} Before giving an instruction on voluntary manslaughter in a murder case, the trial court must determine "whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *State v. Shane* (1992), 63 Ohio St.3d 630, 590 N.E.2d 272, paragraph one of the syllabus. In making that determination, trial courts must apply an objective standard: "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." Id. at 635, 590 N.E.2d 272.

{¶ 82} First, Elmore asserts that he was entitled to an instruction on voluntary manslaughter because Annarino provoked him by threatening and screaming at him. Elmore's argument relies on his version of events in his statements to the police. Elmore told the police, "[Annarino] got in my face and started * * * screaming and stuff. She said, I ought * * * [to] just kill you * * * and I just told her * * * [to] leave me alone and quit going off on me." Elmore claimed that he told Annarino, "[Y]ou're making me angry * * * [and] I'm gonna go off on you Pam. She just kept on * * * so I went downstairs and I got the pipe. I came back up. She just started * * * arguing at me * * * [s]o * * * I hit her."

{¶ 83} Even if Elmore's version of events is true, Annarino's alleged comments did not provide sufficient provocation to warrant an instruction on voluntary manslaughter. In *State v. Shane*, 63 Ohio St.3d at 638, 590 N.E.2d 272, we held that an admission of infidelity by the defendant's fiancée was not reasonably sufficient to provoke the defendant into using deadly force. We found that the victim had done very little to provoke that defendant and that words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations. Id. at paragraph two of the syllabus. In the case now before us, there was even less provocation because Elmore and Annarino were no longer involved in a personal relationship, and Elmore broke into her house before confronting her.

{¶ 84} Second, Elmore argues that he was entitled to an instruction on voluntary manslaughter because Annarino "could have been the aggressor by physically fighting" with him. But there was no evidence that Annarino was the aggressor. Rather, Elmore broke into Annarino's home, waited for her to arrive home from her son's wedding, and then attacked and killed her. Dr. Lee testified that lacerations and contusions on Annarino's forearms were defensive wounds. Moreover, Elmore's claim that the presence of black hairs in dried blood on Annarino's hand and an injury to her thumbnail provide evidence that Annarino attacked him is pure conjecture.

{¶ 85} The evidence shows that when Elmore killed Annarino, he was not under the influence of sudden passion or in a sudden fit of rage. During his argument with Annarino, Elmore went downstairs, picked up the lead pipe that he had brought into the house, went back upstairs, and hit her on the head with the pipe four to five times, killing her. From the evidence presented, the trial court could rightly find that a voluntary-manslaughter instruction was not warranted. See *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 70 (voluntary-manslaughter instruction not warranted when one victim was shot five times and the other victim was shot in the back of the head); *State v. Carter* (2000), 89 Ohio St.3d 593, 602, 734 N.E.2d 345 (voluntary-manslaughter instruction not warranted where victim was stabbed 18 times).

{¶ 86} Based on the foregoing, we hold that the trial court did not abuse its discretion by refusing to instruct on voluntary manslaughter, and proposition XIV is overruled.

{¶ 87} ***Juror smoke breaks during deliberations.*** In proposition of law I, Elmore argues that the trial court abused its discretion by denying the jury's request to smoke during the guilt-phase and penalty-phase deliberations.

{¶ 88} While the guilt-phase deliberations were underway, the jury sent the trial court a request to smoke. The trial court responded:

{¶ 89} "The Court: * * * Jury has a question, can we smoke. The Court has indicated, sorry, no. Agreed to by counsel?

{¶ 90} "Mr. Rigg: By defense, yes.

{¶ 91} "Mr. Rossi: Yes, your Honor."

{¶ 92} The jury returned its guilt-phase verdict approximately three and one-half hours after making this request. The jury deliberated slightly more than three hours before returning its sentencing verdict.

{¶ 93} Elmore claims that the trial court erred by refusing to permit the jurors to smoke during deliberations because of the "well known features of nicotine withdrawal." Elmore argues that the juror who was not permitted to smoke "may have spent more time reviewing and concentrating on the case if [he or she] had been allowed to satisfy [his or her] nicotine addiction." Elmore suggests that the trial court's refusal to permit smoking may explain the brevity of the jury's deliberations. However, counsel consented to the trial court's ruling and thus waived all but plain error. See *State v. Green* (2000), 90 Ohio St.3d 352, 371, 738 N.E.2d 1208; *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

{¶ 94} The record indicates that there was only one smoker on this jury. Elmore's claim that this juror suffered from nicotine withdrawal is totally speculative. The simple request, "can we smoke?" does not indicate any type of emergency. There is no support in the record for Elmore's claim that the juror who wished to smoke was under any additional stress occasioned by "mentally wanting, and physically needing to smoke tobacco." Nor is there any evidence that this juror rushed the other jurors during their deliberations. There is also no protected class of jurors who have the right to smoke during a trial.

{¶ 95} In any event, jurors could not take smoking breaks outside the jury room after submission of the case because "R.C. 2945.33 and Crim.R. 24(G) clearly contemplate that jurors in capital cases generally must not be permitted to separate during their * * * deliberations." *State v.* Davis (1992), 63 Ohio St.3d 44, 48, 584 N.E.2d 1192; see, also, *State v. Sanders* (2001), 92 Ohio St.3d 245, 249, 750 N.E.2d 90 (trial court under no obligation to provide jurors with smoke breaks). Based on the foregoing, we find no plain error, and proposition I is rejected.

### Penalty-phase issues

{¶ 96} *Ineffective assistance of counsel.* In proposition of law X, Elmore argues that his counsel provided ineffective assistance during the penalty phase.

{¶ 97} **Testimony about Elmore's prison records**. Elmore claims that his lawyers were ineffective when they elicited testimony about his bad behavior and inappropriate sexual conduct while in prison. Elmore claims that trial counsel's

questioning opened the door on cross-examination to testimony that he had masturbated "at female officers."

{¶ 98} Dr. Jeffrey Smalldon, a clinical psychologist, was a defense mitigation witness. During Dr. Smalldon's testimony, trial counsel asked the following question about Elmore's prison records:

{¶ 99} "Q: * * * What do you learn from those records that you've collected * * * when he was incarcerated. What did you learn from those records in terms of his adjustment and in terms of his abilities while he was in prison?

{¶ 100} "A: Well, most of these records document the years that he's spent in the Ohio prison system. They're full of bad behavior. * * * [H]e's been a difficult inmate most of the time. * * * [T]here are documented instances of sexually inappropriate behavior. There are instances documented in those records where he's refused orders of people in positions of authority. There are documented instances of interpersonal conflict with other * * * inmates."

{¶ 101} During cross-examination, Dr. Smalldon was asked about a memorandum addressing Elmore's prison behavior that was prepared by Dr. J. Michael Harding, a clinical psychologist:

{¶ 102} "Q: We just have one more exhibit that's been marked State's Exhibit 59 for identification purposes, and I want * * * [to ask] if you can identify what that is?

{¶ 103} "A: This is a memorandum dated April 28th, 2000. It's from Noble Correctional Institution.

{¶ 104} "Q: You testified on direct exam that Mr. Elmore had been cited while he was incarcerated * * * for some sexual misconduct?

{¶ 105} "A: Right.

{¶ 106} "Q: Does that refer to that sexual misconduct?

{¶ 107} "A: Yes.

{¶ 108} " * * *

{¶ 109} "Q: What type of sexual misconduct?

{¶ 110} "A: This says that he's received several tickets for masturbating at female officers.

{¶ 111} " * * *

{¶ 112} "Q: In the letter, Dr. Harding writes with regard to this particular type of conduct, 'Some individuals tend to engage in such behavior because of poor impulse control or similar reasons that stem from symptoms of mental illness. Lastly, some individuals engage in such behavior because [they] make a conscious decision to do that independent of any influence [of] mental illness or psychological distress.' Would you agree with that?

{¶ 113} "A: I agree that that's what he wrote, and I agree that that's true of some individuals, yes.

{¶ 114} "Q: And he finishes by saying, 'It is likely that he,' meaning Mr. Elmore, 'masturbates in the presence of female officers because he chooses to do so. It is suggested that this situation be viewed as a custody rather than a mental health issue[.']

{¶ 115} "A: I read that record. I remember that very well. What struck me the most about it is the reason that he cited for that conclusion, which was the fact that Mr. Elmore refused to talk with him. In my opinion, that's not an adequate foundation for the clinical conclusion that he arrived at."

{¶ 116} The defense decision to call or not call a mitigation witness is a matter of trial strategy. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Likewise, the scope of questioning is generally a matter left to the discretion of defense counsel. Debatable trial tactics generally do not constitute ineffective assistance of counsel. *State v. Singh,* 157 Ohio App.3d 603, 2004-Ohio-3213, 813 N.E.2d 12, ¶ 43.

{¶ 117} Eliciting testimony that Elmore's prison records are "full of bad behavior," contain "documented instances of sexually inappropriate behavior," and include "instances * * * where he's refused orders of people in positions of authority" could have been a trial tactic to support the defense theory that Elmore was impulsive, lacked control over his behavior, and made foolish choices, in an attempt to counteract the claim of aggravated murder and seek a reduction to murder, which did not carry the death penalty. While such testimony was also damaging, counsel needed some evidence to support the theory of an impulsive act. These are risks counsel must weigh, especially when confronted with such strong evidence as here. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Even if trial counsel's questioning reflected deficient performance, Elmore fails to establish prejudice under the *Strickland* test. Testimony that Elmore behaved badly in prison, disobeyed orders, and masturbated at female officers cannot be viewed as affecting his death sentence when weighed against the proven aggravating circumstances of the murder itself. Moreover, we shall disregard such testimony during our independent reassessment of the sentence, which will correct any error. See *State v. Twyford* (2002), 94 Ohio St.3d 340, 363, 763 N.E.2d 122; *State v. Davie* (1997), 80 Ohio St.3d 311, 322, 686 N.E.2d 245.

{¶ 118} **Failure to call family members as mitigation witnesses.** Elmore contends that his counsel were ineffective by failing to call his brother, Demetrius Elmore, and other family members as mitigation witnesses.

{¶ 119} "The decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *State v. Keith*, 79 Ohio St.3d at 536, 684 N.E.2d 47. Moreover, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy* (2001), 91 Ohio St.3d 516, 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

{¶ 120} First, Elmore claims that his counsel should have called Demetrius as a witness to corroborate Dr. Smalldon's testimony about Elmore's dysfunctional family life. After repeated attempts to contact Demetrius, Dr. Smalldon talked with Demetrius on the day before Dr. Smalldon testified. Dr. Smalldon testified that Demetrius was living in Arizona and had "had relatively little contact with [Elmore] or with other members of [the Elmore] family for years." According to Dr. Smalldon, Demetrius confirmed that their father had been an alcoholic, "very violent," and had sexually abused Elmore's two sisters. Demetrius also confirmed that, as young children, "they were frequent witnesses to their father beating their mother."

{¶ 121} Thus, Dr. Smalldon testified about what Demetrius had told him about Elmore's dysfunctional family life, and the jury heard that testimony. It is totally speculative whether Demetrius could have provided other favorable mitigating testimony in view of his limited contact with Elmore and other family members. We conclude that counsel's decision not to call Demetrius as a mitigation witness was a "tactical choice" that cannot rightly be viewed as the ineffective assistance of counsel. See *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 241.

{¶ 122} Second, Elmore claims that his counsel were deficient by failing to call Florence Elmore, his stepmother, and Sonya and Nicki, his two sisters, as mitigation witnesses. Elmore contends that these family members could have provided relevant and credible mitigating evidence.

{¶ 123} Dr. Smalldon interviewed Florence before he testified. According to Dr. Smalldon, Florence did not provide any reliable information about Elmore's upbringing. Florence denied any history of violence in the family. She also stated that she "didn't know a thing about [the sexual-abuse allegations] at the time." Moreover, Dr. Smalldon testified that Florence "wanted nothing to do with these proceedings." Thus, it is highly questionable whether Florence's testimony would have helped the defense case, and it evidently would have contradicted Demetrius's testimony and could have damaged the defense strategy in mitigation. Under these circumstances, trial counsel made a legitimate tactical decision in not calling her as a mitigation witness.

{¶ 124} We also reject Elmore's claim that his lawyers were ineffective by not calling Elmore's sisters, Nicki and Sonya, as witnesses. Dr. Smalldon testified

about allegations that Elmore's father sexually abused Nicki and Sonya. However, the defense could not talk to Nicki because, according to Dr. Smalldon, "[s]he is currently * * * living with Florence Elmore [and] categorically refused to speak with anyone who was involved in her brother's defense." The defense could also not contact Sonya because, as Smalldon testified, she "has not * * * been in any sort of regular contact with family members in at least 16 years * * * [and n]o one even knows where Sonya is at this point." Elmore has failed to proffer additional information that Sonya and Nicki would have provided as witnesses. Thus, it is highly speculative whether their testimony would have added anything to Elmore's mitigation or made any difference in the outcome of the case, even if they could have been located or compelled to testify. Moreover, trial counsel presented other evidence about the sexual-abuse allegations. Dr. Smalldon testified that Elmore discussed watching his father sexually abuse his two sisters, Demetrius verified Elmore's allegations, and Franklin County Children Services records documented that allegations of sexual abuse had been made against Elmore's father, again putting this evidence before the jury. Under these circumstances, we conclude that trial counsel's failure to call Nicki and Sonya as witnesses did not constitute ineffective assistance of counsel.

{¶ 125} Based on the foregoing, we overrule proposition X.

{¶ 126} *Merger.* In proposition of law XI, Elmore claims that the trial court erred by failing to merge the aggravated-burglary and aggravated-robbery aggravating circumstances. He argues that merger was required because the two aggravating circumstances arose from the same course of conduct.

{¶ 127} Elmore's failure to object to the allegedly duplicative nature of the two aggravating circumstances waived all but plain error. *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 65; *State v. Cook,* 65 Ohio St.3d at 528, 605 N.E.2d 70.

{¶ 128} In any event, the aggravated-burglary and aggravated-robbery specifications were not subject to merger, because they were committed with a separate animus. The burglary was complete as soon as Elmore broke into Annarino's home with the intent to commit murder, robbery, theft, or kidnapping. Elmore committed aggravated robbery when he stole Annarino's purse after killing her. Thus, the aggravated burglary and aggravated robbery were separate offenses and constituted separate aggravating circumstances because they arose from different acts. See *State v. Monroe,* 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 68; *State v. Williams* (1996), 74 Ohio St.3d 569, 580, 660 N.E.2d 724; *State v. Frazier* (1979), 58 Ohio St.2d 253, 256, 12 O.O.3d 263, 389 N.E.2d 1118.

{¶ 129} Accordingly, we find no plain error, and proposition XI is overruled.

{¶ 130} *Noncapital sentencing.* In supplemental proposition of law XVII, Elmore argues that the trial court erred by sentencing him on his noncapital offenses to maximum and consecutive sentences in violation of *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403.

{¶ 131} The trial court sentenced Elmore to ten years' confinement for kidnapping (Count 3), ten years' confinement for aggravated robbery (Count 4), ten years' confinement for aggravated burglary (Count 5), and 18 months' confinement for grand theft (Count 6). The trial court ordered in its sentencing entry that "Count 3 shall run concurrently with all other counts; Counts 4, 5, and 6 shall all run consecutively to one another and consecutive to Count 1."

{¶ 132} The trial court made the following findings for imposing maximum and consecutive sentences:

{¶ 133} "The Court is imposing the maximum penalty for the counts finding specifically that a shorter term would not adequately punish the defendant nor protect the public; further, that the worst form of the offense has been committed; and that the offender poses a great likelihood of committing future crimes if he were to be released.

{¶ 134} "The Court is also ordering * * * consecutive sentences finding specifically * * * that it is necessary to protect the public; that it is appropriate with regard to punishing the defendant; that the sentences are not disproportionate; further, that the harm caused was so great that a single term would not adequately reflect the seriousness of the criminal conduct; and that the offender's criminal history shows that consecutive terms are needed to protect the public.

{¶ 135} "The Court would also adopt the facts and circumstances with regard to the consecutive sentences and the maximum sentences that have been presented in this case that are relevant to what it has previously indicated regarding consecutive sentences and the maximum sentence."

{¶ 136} Trial counsel objected on the record to the imposition of the maximum and consecutive sentences "in light of recent Supreme Court holdings concerning the sentencing of criminal defendants."

{¶ 137} Based upon *Apprendi v. New Jersey* (2000), 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435, and *Blakely v. Washington,* we recently declared parts of Ohio's felony-sentencing scheme unconstitutional. *State v. Foster,* 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. The unconstitutional provisions include R.C. 2929.14(C), which relates to the imposition of maximum sentences, and R.C. 2929.14(E)(4), which relates to the imposition of consecutive sentences. Following *Blakely,* we ruled that the sentencing criteria set forth in R.C. 2929.14(C) and 2929.14(E)(4) are unconstitutional because of the requirement for

judicial findings of fact beyond those determined by the jury or admitted by the defendant. *Foster* at ¶ 62–67, 83.

{¶ 138} In *Foster*, we severed the unconstitutional provisions of the sentencing code, including R.C. 2929.14(C) and 2929.14(E)(4), and remanded the cases for resentencing. We further stated that "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum [or] consecutive * * * sentences." Id. at ¶ 100.

{¶ 139} In the present case, we hold that the trial court's factfinding in support of maximum and consecutive sentences violated *Foster*. We reject the state's argument that Elmore's challenge to the noncapital sentences is rendered moot by Elmore's death sentence. The trial court's reliance on unconstitutional sentencing statutes when imposing maximum and consecutive sentences on the noncapital offenses violated Elmore's constitutional rights and must be corrected.

{¶ 140} We find that proposition XVII has merit. Thus, we remand Elmore's case to the trial court for a new sentencing hearing on the noncapital offenses in accordance with *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

### Cumulative errors

{¶ 141} In proposition of law XVI, Elmore argues that cumulative trial errors deprived him of a fair trial and mandate a reversal of his death sentence. However, Elmore received a fair trial. Moreover, "errors cannot become prejudicial by sheer weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068. Thus, this proposition is rejected.

### Constitutionality

{¶ 142} In proposition of law IX, Elmore attacks the constitutionality of Ohio death-penalty statutes. We also reject this claim. See *State v. Carter*, 89 Ohio St.3d at 607, 734 N.E.2d 345; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

### Proportionality

{¶ 143} In proposition of law VII, Elmore claims that his death sentence is disproportionate to death sentences imposed in similar cases. We shall address this argument during our independent sentence evaluation.

### Sufficiency and weight of the aggravating circumstances

{¶ 144} In proposition of law XII, Elmore argues that his death penalty must be vacated because the aggravating circumstances do not outweigh the mitigating factors. This argument will also be addressed during our independent sentence evaluation.

## INDEPENDENT SENTENCE EVALUATION

{¶ 145} *Aggravating circumstances.* The evidence established beyond a reasonable doubt that Elmore was properly convicted of the murder of Pamela Annarino while committing or attempting to commit aggravated robbery, R.C. 2929.04(A)(7), and murder while committing or attempting to commit aggravated burglary, R.C. 2929.04(A)(7).

{¶ 146} As discussed earlier, the trial court merged Specifications 1 (escaping detection) and 2 (kidnapping) with Specifications 3 (aggravated robbery) and 4 (aggravated burglary) during the penalty phase. Thus, we—as did the jury—will consider only Specifications 3 and 4 in weighing the aggravating circumstances against the mitigating factors.

{¶ 147} *Mitigation evidence.* Elmore called one mitigation witness and made an unsworn statement.

{¶ 148} **Elmore's unsworn statement.** Elmore stated, "First and foremost, I have to say to Pamela's family that I'm truly sorry for what I've done. Why it happened, I just * * * don't know. I really don't know. But I feel that I deserve the worst punishment that there is. That's one thing I agree with the prosecutor. And I never knew that I could take someone's life, and each and every day I relive that, * * * and it's never going to go away. If I could bring her back, I would bring her back. I really would. I don't understand why I did it. I ask myself that every day, each and every day. The nightmares, it's just too much. If I could give my life for her right now, I would with no hesitation, none. And I'm sorry. I'm truly sorry."

{¶ 149} Dr. Jeffrey Smalldon evaluated and conducted psychological testing of Elmore, reviewed Elmore's records, and interviewed Elmore's family members. Dr. Smalldon's evaluation raised no questions about Elmore's sanity or competency.

{¶ 150} Elmore was raised in a dysfunctional family. Elmore's father was described by Dr. Smalldon as an alcoholic who was "very violent * * * particularly when he was drinking." According to Dr. Smalldon, Elmore told him that as a child, Elmore "wanted [his father] dead because [he] watched him beat [his] mother. He beat me. He beat my brother."

{¶ 151} Elmore and his brother, Demetrius, reported to Dr. Smalldon that their father had sexually abused their sisters, Sonya and Nicki. Elmore told Smalldon that when he was approximately six years old, he saw his father having sexual intercourse with Nicki. On another occasion, Elmore, according to Dr. Smalldon, "observed his father having sexual intercourse with Sonya." Franklin County Children Services records also document allegations that Elmore's father

sexually abused Sonya and Nicki. According to Dr. Smalldon, Elmore "experienced intense feelings of helplessness and rage in response to the things that he observed in his home."

{¶ 152} Elmore was not a very motivated student and did not do well in school. He would "typically get C grades." Elmore's work history, Dr. Smalldon explained, is "almost nonexistent." Elmore worked for a couple of years at a Wendy's restaurant, and this was his longest period of employment. Elmore was described in the prison records that Dr. Smalldon recounted for the jury as an "excellent worker" and a "hard worker" in his prison jobs.

{¶ 153} Dr. Smalldon told the jury that Elmore has a "history of aggressive behavior." Records that Smalldon described at the trial indicated that Annarino had applied for a civil protection order because "she felt threatened by [Elmore] prior to this offense."

{¶ 154} Elmore was first sent to prison when he was approximately 20 years old. Elmore's records, according to Dr. Smalldon, show that he was "in and out [of prison] * * * many times" until his release in 2001. Dr. Smalldon testified that Elmore "repeatedly found himself * * * unable to cope out in the community and would behave * * * in a self-defeating way that would assure [that he would be] sent back into an environment that was more structured and * * * [where] he felt more comfortable."

{¶ 155} Tests administered by Dr. Smalldon before the trial indicated that Elmore suffered from a "clinically significant amount of depression." Personality testing indicated "rebellious or anti-social attitudes." According to Dr. Smalldon, Elmore has always viewed himself as an "outsider, something of a rebel, someone who doesn't like rules, doesn't like people telling him what to do, and has, at times, responded badly when they've attempted to."

{¶ 156} Elmore reported to Dr. Smalldon before the trial that he had sustained a head injury when he was 17 years old. Medical records could not be found to corroborate those injuries. However, Dr. Smalldon testified that neuropsychological testing points to the existence of a "relatively mild brain impairment."

{¶ 157} Dr. Smalldon testified that Elmore knew that what he was doing was wrong when he murdered Annarino and committed the other crimes. He also testified that Elmore is not mentally retarded.

{¶ 158} Testing showed that Elmore has a full-scale IQ in the low 70s. Dr. Smalldon believes that "at his best, when he wasn't in jail," Elmore would score in the high 70s or very low 80s on an IQ test.

{¶ 159} Dr. Smalldon diagnosed Elmore with dysthymia, a longstanding relatively low-grade depression. Elmore was also diagnosed with "a history of polysubstance abuse, including abuse of crack cocaine." Additionally, Dr. Small-

don diagnosed Elmore with "a personality disorder not otherwise specified" and "low intellectual functioning."

{¶ 160} Finally, Dr. Smalldon testified that Elmore expressed remorse for what he did. Elmore told him that "it would demean the victim * * * [to] go before the jury and ask for forgiveness."

### Sentence evaluation

{¶ 161} We find nothing in the nature and circumstances of the offense to be mitigating. On the afternoon of June 1, 2002, Elmore broke into Annarino's home. That same day, Elmore murdered Annarino by strangling her and hitting her on the head with a pipe. Afterwards, Elmore stole her purse and fled in her car. These facts establish a horrific crime without any mitigating features.

{¶ 162} Elmore's character offers nothing in mitigation. However, his history and background provide some mitigating features. Elmore was raised in a dysfunctional family. His father was a violent alcoholic. As a child, Elmore watched his father beat his mother and sexually abuse his two sisters. His father also beat Elmore. Moreover, Elmore has a low IQ.

{¶ 163} The statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(4) (youthfulness of the offender; i.e., Elmore was 38 years old at the time of the offense); (B)(5) (lack of a significant criminal record); and (B)(6) (accomplice only).

{¶ 164} We find that Elmore's intellectual deficiencies, longstanding depression, and mild brain impairment do not qualify as an R.C. 2929.04(B)(3) factor because there was no evidence that Elmore's condition caused him to lack the substantial capacity to appreciate the criminality of his conduct. See *State v. Williams* (1995), 73 Ohio St.3d 153, 174, 652 N.E.2d 721; *State v. Gumm* (1995), 73 Ohio St.3d 413, 432, 653 N.E.2d 253.

{¶ 165} Nevertheless, we give some weight to Elmore's limited intellectual abilities and other mental deficiencies under the catchall provision of R.C. 2929.04(B)(7). Testing showed that Elmore's IQ is in the low 70s. However, Elmore is not mentally retarded. Dr. Smalldon also testified that Elmore knew he was wrong when he murdered Annarino and committed his other crimes.

{¶ 166} We give weight to Elmore's cooperation with the police after his arrest under R.C. 2929.04(B)(7). See *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 104. We also give weight to Elmore's apology to the victim's family and expressions of remorse in his unsworn statement. See *State v. Bey* (1999), 85 Ohio St.3d 487, 509, 709 N.E.2d 484. We find no evidence of any other mitigating factors under R.C. 2929.04(B)(7).

{¶ 167} We find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Elmore murdered Annarino during the course of an aggravated robbery and an aggravated burglary. Compared with these serious aggravating circumstances, Elmore's mitigating evidence has little significance.

{¶ 168} Finally, we find that the death penalty is proportionate to death sentences approved for other robbery-murder and burglary-murder cases. See *State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 124; *State v. Jones* (2000), 90 Ohio St.3d 403, 423, 739 N.E.2d 300; *State v. Stallings* (2000), 89 Ohio St.3d 280, 301, 731 N.E.2d 159; *State v. Murphy* (1992), 65 Ohio St.3d 554, 586, 605 N.E.2d 884.

### *Conclusion*

{¶ 169} We affirm Elmore's convictions and sentence of death. However, we remand this case to the trial court for resentencing on the noncapital offenses in accordance with *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Robert L. Becker, Licking County Prosecuting Attorney, and Kenneth W. Oswalt, Assistant Prosecuting Attorney, for appellee.

W. Joseph Edwards and Keith A. Yeazel, for appellant.

Jim Petro, Attorney General, Douglas R. Cole, State Solicitor, and Diane Richards Brey and Franklin E. Crawford, Deputy Solicitors, urging affirmance for amicus curiae Ohio Attorney General.

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor and Seth L. Gilbert, Assistant Prosecuting Attorneys, urging affirmance for amicus curiae Ohio Prosecuting Attorneys Association.