OPINION
{¶ 1} Appellant, Jeffrey L. Town, appeals from the judgment of conviction of the Trumbull County Court of Common Pleas, following a trial by jury, in which a verdict was reached convicting him of three counts of rape, one count of kidnapping, one count of gross sexual imposition (GSI), and four repeat violent offender (RVO) specifications. For the reasons discussed herein, the judgment of the trial court is affirmed in part, reversed in part, and remanded. *Page 2 
 {¶ 2} In 2006, the victim, referred to herein by her nickname "Raney," was a 20-year-old high school drop-out, living with her baby daughter and boyfriend, her child's father. She was working as a hotel desk clerk in order to support her family, but the minimum wage positions were insufficient to meet her household living expenses. She eventually resigned, broke up with her boyfriend, and took work as an exotic dancer at a club in Rootstown known as Chaser's. It was there that she met appellant Fourth of July weekend, 2006.
 {¶ 3} Appellant, a 47-year-old bachelor, took an instant liking to Raney and would pay her for "private dances." As time went on, appellant began paying Raney simply to sit and talk with him while he was at the club. When Raney complained about her work at Chaser's, appellant asserted he could help her get a job with his employer working third shift, the same shift he worked. When Raney indicated she had no babysitter for her daughter, appellant recommended a woman in his apartment building who regularly sat for children. Appellant gave Raney his phone number and told her to call him if she was interested. Raney did not pursue these offers but, instead, began working at Club 76, a strip club in Austintown, Mahoning County. As appellant had become one of Raney's "regulars," she notified him of her employment change.
 {¶ 4} Raney's transition to Club 76 allowed her to work more days of the week which also allowed appellant more opportunities to see her. Although appellant periodically paid Raney for private dances, his typical practice was to pay her several hundred dollars to sit and talk with him so she would not have to "hustle" dances from other men. During these discussions, appellant frequently discussed his personal life *Page 3 
and particularly his loneliness. According to Raney, appellant related that he had no friends, few family members, and was dying of cancer.[1]
 {¶ 5} By the late summer of 2006, Raney viewed appellant as a friend. When she began having car trouble, appellant loaned Raney one of his two vehicles, a 1998 Plymouth Breeze. During the several weeks she had the vehicle, appellant would regularly stop at Raney's Newton Falls apartment to perform routine service on the vehicle and put fuel in it for her.
 {¶ 6} After loaning the car to Raney, Tanya Bier, who also lived in Newton Falls, alerted Raney when she observed appellant driving slowly past Raney's apartment. Ms. Bier was aware of appellant's interest in Raney and, in fact, appellant had related to Bier that he loved Raney and would do anything for her and her daughter. Raney apparently was not concerned about this and continued to have a social relationship with appellant.
 {¶ 7} Near the end of the summer of 2006, Raney and her child's father began dating again. When appellant learned of this reconciliation, he repossessed the Breeze without notifying her. Although appellant testified he took the vehicle due to mileage concerns, there was also testimony that appellant disapproved of Raney rekindling her relationship with her child's father. Shortly thereafter, however, Raney again broke off her relationship with her child's father and the tension between appellant and Raney subsided.
 {¶ 8} Appellant and Raney subsequently entered an agreement whereby Raney would purchase the Breeze from appellant. Pursuant to the agreement, Raney would *Page 4 
pay for the vehicle within four months via making weekly payments (in person) to appellant at his home. In the meantime, appellant continued to interject himself into Raney's personal life buying her dinners, repairing the Breeze and purchasing gasoline when necessary, helping her with rent, and buying toys and clothes for Raney's daughter.
 {¶ 9} However, in October of 2006, Raney testified appellant started acting "really weird" and began to "creep" her out. According to Raney, appellant came into Club 76 more frequently and became more possessive of her. Appellant professed his love to Raney, lauded her beauty, and told her he would take care of her and her daughter if she would "just be with him." Although Raney told appellant they were "just friends," he became gradually more insistent and desperate. One day in October, when making her car payment at appellant's apartment, appellant advised Raney he only had one year to live. He then sheepishly offered Raney $10,000 to have sex with him. Raney angrily rebuffed appellant's offer, told him she was not a prostitute, and did not talk to him "for a week or two."
 {¶ 10} The following week, however, Raney attempted to pay her car payment at appellant's apartment, but was unable to locate him. She became concerned due to appellant's purported illness. Approximately two weeks after appellant propositioned Raney, he resurfaced. One evening, as Raney was preparing to leave for work, appellant stopped by her apartment and handed her between $200 and $300 and a Giant Eagle card for groceries. Rather than go to work, appellant stated he wanted her to stay home and relax. After Raney accepted the money, appellant solicited a hug. During the embrace, however, appellant attempted to kiss Raney. She backed away, *Page 5 
handed him his money back, and ordered him out of her apartment. She reiterated that she was not interested in such things and he was not to behave that way. Appellant apologized, left the money and gift card with Raney, and left the apartment. Raney testified after this episode she felt a really "weird vibe" from appellant.
 {¶ 11} By December of 2006, appellant told Raney he was moving out of Newton Falls so his impending death would not burden his surviving family members. He asked Raney to help him clean his apartment in anticipation of his final departure. On December 11, 2006, at approximately 12:30 p.m., Raney arrived at appellant's apartment. As Raney stepped inside and observed the messy residence, appellant grabbed her from behind, placed his right hand over her mouth, and pointed a knife near her face. When Raney attempted to escape from appellant's grip, he tackled her to the floor. While flat on her stomach, appellant straddled her and pinned one of her arms. He advised her that if she did not stay quiet, he would kill her. Despite this threat, Raney was crying, "freaking out," and begging for her life. Appellant seized Raney's arms and duct-taped her hands together behind her back.
 {¶ 12} During the preliminary phases of the attack, appellant ranted about how Raney under-appreciated his generosity. He reminded her that "he wouldn't have to do this" if she would have accepted his $10,000 offer. Appellant lifted Raney to a love seat in his living room and advised Raney that if she did exactly what he said, she would "get out of here alive and [he would not] hurt [her] but that is the only way." In response, Raney "said fine, you can just do whatever you want to me, just let me go." Appellant proceeded to remove Raney's pants and kiss her inner thigh. He attempted to kiss her face, but Raney recoiled. Appellant again told her "if you just do what I say, I'm not *Page 6 
going to hurt you, I don't want to have to hurt you, I don't want to have to kill you." Appellant explained, "I can't make this look like rape because if it looks like rape, I'm going to go to jail * * *." Appellant then escorted Raney to his bedroom.
 {¶ 13} Once in the bedroom, Raney again began to cry and plead with appellant not to harm or rape her. Appellant responded, "I just want to be with you. I don't understand why you wouldn't just be with me, if you would have taken the money we wouldn't have to do this." Appellant left the room and returned with a roll of toilet paper in his hand. He told her he would remove the duct tape if Raney did not try to fight him; upon receiving another promise that appellant would not kill her, Raney agreed. Appellant removed the duct tape and then removed Raney's shirt. Appellant proceeded to perform oral sex on Raney; he then forced her to perform oral sex on him. After engaging in vaginal intercourse, appellant demanded that Raney "finish [him] off with [her] hand." Appellant subsequently ejaculated on Raney's hand, cleaned himself off, and instructed her to do the same. When Raney was cleaning herself, she realized her hand was bleeding.
 {¶ 14} Raney got dressed and, when appellant went to his closet for something, Raney ran out the front door. She entered her vehicle and drove to Tanya Bier's residence, a short distance from appellant's apartment. When she arrived, Raney was "hysterical" and stated appellant had raped her. Ms. Bier stated she was a "mess," her hand was bleeding, she had marks on her face and blood spots on her clothes. Raney then called her mother, told her she was raped, and that she was afraid her attacker would return to kill her. Her mother instructed her to drive to her house. Upon arrival, she initially refused to notify the police. However, her older brother, also at their *Page 7 
mother's home, called the police and subsequently drove Raney to the hospital. At the hospital, a rape kit was administered and an emergency room nurse documented red marks on Raney's wrists, bruising to the upper lip, a cut to the right side of her cheek, ear, and hand, and blood on her clothes. Raney expressed fear that she would be killed if she reported the incident to the police.
 {¶ 15} Nonetheless, Officer Michael Laswell of the Newton Falls Police Department met Raney at the hospital and she provided him with a statement about the episode. Based on the statement, Officer Laswell obtained a search warrant for appellant's apartment. The officer gathered the rape kit and the victim's clothing at the hospital. Along with the Bureau of Criminal Identification and Investigation Agent James Ciotti, Officer Laswell removed a host of items from appellant's apartment, including discarded duct tape, toilet paper, two knives (one of which was found under a couch cushion), and bed spreads.
 {¶ 16} Appellant was not on hand for the search of his apartment on December 11, 2006 and failed to report for work that day. He was discovered five days later in Brookpark, Ohio, near the Cleveland Airport. He was carrying approximately $10,000 in a case at the time of his arrest. On February 16, 2007, the Trumbull County Grand Jury indicted appellant on kidnapping, a felony of the first degree, in violation of R.C. 2905.01(A)(4), together with a repeat violent offender (RVO) specification; one count of GSI, a felony of the fourth degree, in violation of R.C. 2907.05(A)(1); and three counts of rape, felonies of the first degree, each a violation of R.C. 2907.02(A)(2), attached to each rape charge was an RVO specification. After pleading not guilty to the charges, a *Page 8 
jury trial commenced. At trial, the foregoing facts were heard by the jury. Moreover, appellant testified on his own behalf.
 {¶ 17} Appellant testified he had spent approximately $2,000 on Raney in the five months they had known one another. He stated he cared for her and desired that she leave the exotic dancing business. Appellant admitted he was attracted to Raney and did not deny the sexual urges he had toward her.
 {¶ 18} On December 11, 2006, when Raney came to his apartment to help him clean it, appellant testified he told her he was aware she had men at her apartment recently. This irritated appellant because he and Raney had a purported agreement that she would tell him if she began seeing anyone because he did not want to give her money to spend on a boyfriend. According to appellant, Raney became physically violent when he brought this to her attention. In an effort to defend himself and diffuse the situation, appellant testified he brandished a knife. During his attempt to "calm" the girl, she was cut. Appellant claimed Raney eventually ceased her attack and he put the knife down but, according to his testimony, Raney kept "running her mouth." Appellant then pushed Raney on the couch, and pinched her hand and cheek in an effort to "shut her up."
 {¶ 19} Appellant advised Raney that he was no longer going to give her any money and that she was obligated to pay off the Breeze by January of 2007. In recognition of Raney's financial difficulties, appellant proposed she "could take care of [the car payments] in other ways." Appellant testified she agreed to have intercourse with him but only if she was bound with duct tape. He agreed to bind her but he eventually had to remove the tape because it was too difficult to engage in the various *Page 9 
modes of intercourse in which he was interested. Appellant testified he had oral and vaginal sex with Raney and she administered oral sex on him. Once they finished, appellant testified they were on "good terms." He then left the room to retrieve the title to the Breeze in order to sign the vehicle over to Raney. However, at this point, appellant claimed Raney inexplicably left the apartment in great haste and advised him she was going to report him for rape. Appellant categorically stated the sex was completely consensual and denied ever attacking or threatening Raney.
 {¶ 20} On September 11, 2007, the jury returned guilty verdicts on all counts. On October 22, 2007, the trial court announced its guilty findings on the repeat violent offender specifications and its judgment on sentence. Specifically, appellant was sentenced to ten years on the kidnapping conviction with one year on the RVO specification to run consecutively to the principal sentence; eighteen months on the GSI conviction; and ten years on each rape conviction with one year on each RVO specification to run consecutively to the principal sentences. The court ordered that the sentences on the three rape convictions to run consecutively to each other. The court further ordered that the sentences for kidnapping and GSI run concurrently with the three rape sentences for an aggregate term of thirty-three years imprisonment. The judgment on sentence was journalized on November 5, 2007.
 {¶ 21} Appellant now appeals and assigns three errors for our review.
 {¶ 22} Under his first assignment of error, appellant asserts:
 {¶ 23} "Convictions and prison sentences violate U.S. Const. amend. VIII and XIV and Ohio Cost. Art. I, [Sections] 1, 2, 9, and 16 when the convictions are against the manifest weight of the evidence." *Page 10 
 {¶ 24} Appellant's first assignment of error represents a challenge to the weight of the evidence upon which his convictions are based. An evaluation of the weight of the evidence concerns the inclination of the greater amount of credible evidence, offered at trial, to support one side of the issue rather than the other. State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. If, on weighing the evidence, the jury determines the greater amount of credible evidence sustains the issue the state has sought to establish beyond a reasonable doubt, the state will be entitled to its verdict. Id. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) Id., citing Black's Law Dictionary (6th ed. 1990), 1594. Hence, a court reviewing the weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way. State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, *14-*15.
 {¶ 25} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175. Accordingly, the role of an appellate court reviewing the evidential weight is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. State v. Brown, 11th Dist. No. 2002-T-0077, 2003-Ohio-7183, at ¶ 52, citingThompkins, supra, at 390. However, a reviewing court must defer to the factual findings of the jury regarding the weight to be given the evidence and credibility of the witnesses. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. *Page 11 
 {¶ 26} When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. The jury is free to believe all, some, or none of the testimony of each witness appearing before it. Brown, supra, at ¶ 53. Moreover, if the evidence admits to more than one interpretation, a court of error must interpret it in a manner consistent with the verdict. Id. "As trial courts often note, proof beyond a reasonable doubt does not mean proof beyond any doubt." State v. Burgess, 11th Dist. No. 2002-L-019, 2004-Ohio-3338, at ¶ 37.
 {¶ 27} Appellant was convicted on one count of kidnapping, in violation of R.C. 2905.01(A)(4), [2] one count of GSI, in violation of R.C. 2907.05(A)(1), [3] and three counts of rape, each a violation of R.C. 2907.02(A)(2).[4] Appellant contends the jury clearly lost its way in resolving the conflicts between his testimony and Raney's testimony against him. In appellant's view, the evidence against him, primarily based upon Raney's version of events, was fundamentally untenable if not "incredible." Specifically, *Page 12 
appellant asserts any injuries she had were consistent with his version of events. Appellant also points out that Raney testified she refused to call the police or go to the hospital because she was afraid for her life. However, immediately after the episode, she drove, in his car, from his apartment, not to the police, but to a friend's house, then to her mother's house. In appellant's view, such actions are inconsistent with one who had just experienced the violent physical and emotional trauma of a rape.
 {¶ 28} This case cannot be resolved merely upon a weighing of each parties rendition of the events in a vacuum. Rather, each witness' rendition of events must be observed in the context and background of the months preceding the episode at issue. With this in mind, much of the evidence presented at trial lends support to Raney's account.
 {¶ 29} Specifically, Tanya Bier testified that appellant confessed his love for Raney to her several months prior to the attack. She further observed him, prior to the assault, slowly patrolling the area surrounding Raney's residence. Although appellant testified he did not "spy" on Raney, he admitted to effectively surveying her parking lot for vehicles with which he was unfamiliar. Appellant regularly frequented the clubs at which Raney danced and, ultimately, became so possessive he would pay her large amounts of money simply to sit with him exclusively. Appellant routinely filled the Breeze with fuel for Raney's use and performed unsolicited service on the car while it was in Raney's possession. He lavished gifts of money on Raney, made it clear he was attracted to her, and would do anything to help her. Appellant did not deny these points and, when asked why he did such things, he testified "[w]ell, I liked her. She's very attractive." *Page 13 
 {¶ 30} Furthermore, Raney testified that she had refused appellant's $10,000 offer for sex and, on a separate occasion, refused to accept an offer of money and a Giant Eagle grocery card after appellant tried to kiss her. The foregoing evidence suggests that appellant had a prurient, obsessive attraction to Raney which was not quelled by her declinations of his physical advances. While she did not generally refuse appellant's monetary offers, she did not request money from appellant and she was not interested in a quid pro quo sexual relationship with appellant.
 {¶ 31} With this backdrop in mind, we shall briefly compare Raney's and appellant's respective versions of events. Raney testified in great detail that, she arrived at appellant's apartment to help him clean. While Raney inspected the apartment, appellant placed his hands over her mouth and held a knife to her face. In a struggle to free herself, she was pushed to the floor on her stomach, straddled by appellant, and had her hands duct-taped behind her back. According to Raney, appellant said he would not kill or harm her if she cooperated; she agreed and appellant proceeded to rape her via cunnilingus, fellatio, and vaginal penetration. After the episode finished, she cleaned herself and, while appellant attempted to retrieve something from his closet, Raney fled the apartment. She testified she was frantic and scared for her life. After making her escape, Raney first called upon Ms. Bier and then her mother. When asked why she did not go immediately to the police, she testified:
 {¶ 32} "I was terrified. I was terrified. I just didn't want to be alone, I was so scared. I didn't know if he was going to get in his car and chase me or follow me, I didn't know what to do. I was in panic mode and I knew Tanya was closest to me, and actually Jeff Town's apartment — she lived not in the same apartment complex, but it *Page 14 
was — I mean, less than half a mile down the road and that was just the first thing that came to mind was get to her house because I just wanted to be with somebody that was going to help me."
 {¶ 33} After Raney left Ms. Bier's residence, she drove to her mother's home. Her brother subsequently called the police and convinced her to go to the hospital. She made a police report the same day.
 {¶ 34} Alternatively, appellant contends Raney arrived at his apartment and became furious with him when he questioned her about her new boyfriend. According to appellant, Raney began to slap at him, kick him, and pull his hair. Appellant asserted he grabbed a knife from the table to calm the young woman. During the fracas, appellant concedes he cut Raney and even bruised her face. Appellant claimed that once she calmed down, he pointed out that their contract required her to pay off the Breeze within about a month and, because she did not tell him about her boyfriend, he would no longer be giving her money.
 {¶ 35} According to appellant, Raney stated she did not know where she would get the money for the car. Appellant indicated there were "other ways" to pay off the car. Upon this suggestion, appellant testified that he and Raney had consensual oral sex and vaginal intercourse. After they finished, appellant and Raney cleaned themselves, got dressed, and shared a pop. Although the atmosphere was congenial, appellant stated Raney was still worried about the vehicle and sought some assurance that appellant would transfer the title. Appellant left the room to obtain the title from a lockbox in his room and, when he returned, Raney was standing at or near the door. According to appellant, Raney then ran out the door and told him "I'm going to tell them *Page 15 
that you raped me." Appellant testified he was completely waylaid by Raney's actions and, for reasons unclear from his testimony, he "packed a few things and * * * left." Appellant testified he drove to Kent and spent the night. After returning to find people in his apartment, presumably the authorities, he left again, ended up checking into a hotel near Cleveland, where he was arrested several days later.
 {¶ 36} This case is difficult because it involves a situation where the jury was presented with different versions of the facts by two individuals who were the only direct witnesses to the crimes charged. Notwithstanding, it was within the province of the jury to assess the credibility of these witnesses and it cannot be considered a manifest miscarriage of justice that they found Raney more believable than appellant. After engaging in a limited weighing of the evidence, we do not believe the jury lost its way. Considering each story, we believe the jury's decision is particularly buttressed by the strange and inexplicable manner in which appellant's version of events concludes; that is, If Raney wanted title to the car transferred and appellant produced the title presumably for that purpose, there is no reasonable explanation for her spontaneous exodus. Moreover, appellant's story fails to illuminate why Raney would advise him that she was going to file rape charges against him, i.e., given appellant's version, it would appear both parties had, or were about to receive, what they wanted (appellant: sex; Raney: title to the vehicle). Further, appellant did not provide a cogent explanation for his sudden decision to leave after Raney fled. Without more than the suggestion that he was alarmed and confused, a jury could reasonably interpret appellant's actions as consciousness of guilt. *Page 16 
 {¶ 37} In any event, the jury was entitled to believe Raney's rendition of events as there was ample, credible evidence in support of her version. Therefore, exercising the caution which a reviewing court should use in reviewing a criminal verdict based upon the manifest weight of the evidence, and regarding the jury as best able to weigh the evidence and judge the credibility of the witnesses, appellant's first assignment of error is without merit.
 {¶ 38} Appellant's second assignment of error contends:
 {¶ 39} "The multiple sentences imposed by the trial court here violate the double jeopardy provisions barring multiple punishments for the same conduct and [R.C.] 2941.25."
 {¶ 40} Under his second assignment of error, appellant argues that even if the convictions are supported by the weight of the evidence, the commission of the multiple acts of forcible sexual activity represent one uninterrupted assaultive episode committed with the same animus. Therefore, appellant concludes, the acts must be considered the "same offense" under R.C. 2941.25, Ohio's allied offense statute, and, pursuant to his right to be free from double jeopardy, he may only be punished for a single offense.
 {¶ 41} R.C. 2941.25 provides:
 {¶ 42} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 43} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment *Page 17 
or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 44} The appropriate test for determining whether the multiple offenses at issue are allied offenses of similar import is whether the elements of the crimes, viewed in the abstract, correspond to such a degree that the commission of one crime will result in the commission of the other. State v. Cabrales, 118 Ohio St.3d 54, at paragraph one of the syllabus, 2008-Ohio-1625, see, also, State v. Ranee, 85 Ohio St.3d 638,646, 1999-Ohio-291. To the extent the elements do so correspond, a defendant may not be convicted of both unless the court finds that the crimes were committed separately or with a separate animus. Id. at 638-639.
 {¶ 45} We initially point out that appellant did not seek merger of the various rape and GSI counts. It is well-settled that the failure to object to the trial court's failure to merge charges for sentencing waives all but plain error. State v. Elmore, 111 Ohio St.3d 515, 534,2006-Ohio-6208. As a result, we shall review appellant's challenges for plain error. A plain error is one which affects a party's substantial rights thereby affecting the outcome of the proceedings. See, e.g.,State v. Stanley, 11th Dist. No. 2007-P-0104, 2008-Ohio-3258, at ¶ 29.
 {¶ 46} We shall first address appellant's convictions on three separate counts of rape. The record reveals that appellant initially forced cunniligus on the victim. Appellant then compelled the victim to engage in fellatio. Finally, appellant forced the victim to submit to vaginal intercourse with the victim. The three counts of rape, when their elements are compared in the abstract, are allied offenses of similar import. See, *Page 18 
e.g., State v. Stadmire, 8th Dist. No. 88735, 2007-Ohio-3644, at ¶ 53 (holding rape by digital penetration and rape by vaginal intercourse offenses of similar import).
 {¶ 47} With this in mind, appellant claims that because the three rapes occurred during the same assaultive episode, they were not separate offenses committed with a separate animus. We find this argument unpersuasive. Simply because the three rape convictions arise from the same assaultive episode does not preclude the conclusion that separate crimes occurred. As Chief Justice Celebrezze observed in his concurring opinion in State v. Barnes (1981), 68 Ohio St.2d 13:
 {¶ 48} "`* * * Repeated acts of forcible sexual intercourse are not to be construed as a roll of thunder, — an echo of a single sound rebounding until attenuated. One should not be allowed to take advantage of the fact that he has already committed one sexual assault on the victim and thereby be permitted to commit further assaults on the same person with no risk of further punishment for each assault committed. Each act is a further denigration of the victim's integrity and a further danger to the victim.'" Id. at 16, quoting, Harell v. State
(Wis., 1979), 88 Wis.2d 546; see, also, State v. Nicholas (1993)66 Ohio St.3d 431, 435.
 {¶ 49} Moreover, and perhaps more legally significant, inBarnes, the Supreme Court of Ohio specifically held that a defendant that engages in fellatio followed immediately by vaginal intercourse committed "two * * * offenses of * * * similar kind * * * separately * * * [and] with a separate animus as to each * * *" within the meaning of R.C. 2941.25(B). Barnes, supra, at 14; see, also, Stadmire, supra; State v.Moore, 161 Ohio App.3d 778, 2005-Ohio-3311, at ¶ 86; State v. AbdullahAli (Apr. 28, 1999), 9th Dist. No. 19119, 1999 Ohio App. LEXIS 2014, *9-*10. *Page 19 
 {¶ 50} The conclusion reached in Barnes applies squarely to the instant case. Appellant's three rape convictions are premised upon three diverse sexual acts. These three separate acts, all of which were forced upon the victim against her will, were qualitatively distinct and individually deliberate. Eo ipso, appellant's criminal designs and/or motivations were separate and unique to each particular act. We therefore hold appellant committed the three rapes separately with a separate animus. See Nicolas, supra; see, also, R.C. 2945.25(B);Rance, supra. The three rapes are dissimilar and not subject to merger under R.C. 2945.25. We therefore find no plain error.
 {¶ 51} Next, we shall consider whether the GSI conviction should have merged with the rape convictions. Here, the elements of the GSI and rape offenses of which appellant was charged, when viewed in the abstract, are slightly different, i.e., rape charge requires sexual conduct while the GSI charge requires only sexual contact. However, assuming arguendo, the crimes of rape and GSI are allied offenses of similar import under the test announced in Rance, the evidence in the instant case demonstrates the crimes were committed separately.
 {¶ 52} The evidence in this case demonstrates, immediately subsequent to appellant restraining the victim, he despoiled her of her pants and began kissing her inner thigh. This sexual contact occurred in the living room of appellant's apartment. The sexual conduct constituting the rapes occurred subsequent to the GSI, in appellant's bedroom. The act of kissing the victim's thigh was separate in time and location from the sexual conduct that constituted the rape offenses. Accordingly, the conduct was separate and distinct from the conduct that led to appellant's rape convictions. Thus, we find no plain error. *Page 20 
 {¶ 53} We shall finally consider whether the kidnapping conviction should have been merged with appellant's rape convictions. Although appellant failed to argue the rape and GSI charges were allied offenses for purposes of merger, he did seek such a finding from the trial court on the kidnapping charge. We therefore hold this issue was properly preserved.
 {¶ 54} The Supreme Court of Ohio has held that, even though their elements do not align exactly, kidnapping and rape are allied offenses of similar import. Cabreles, supra, at 60, citing, State v. Adams,103 Ohio St.3d 508, 528, 2004-Ohio-5845. Consequently, to obtain separate convictions for rape and kidnapping, there must be evidence that the defendant committing the offense of kidnapping with an animus independent of the rape. See State v. Logan (1979), 60 Ohio St.2d 126,131. The Court in Logan set forth assistive guidelines to determine whether kidnapping and rape are committed with a separate animus so as to permit separate punishments under the merger statute, stating:
 {¶ 55} "Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions[.]" Id. at subparagraph (a) of the syllabus.
 {¶ 56} In this case, appellant restrained the victim first by wrestling her to the ground, then by sitting upon her, and finally by duct-taping her arms behind her back. While the record does not indicate the length of time she was manacled, the victim *Page 21 
testified appellant removed the duct tape immediately prior to the commencement of the rapes. Even after the tape was removed, the victim was nevertheless compelled to remain stationary throughout the commission of the sexual assaults by virtue of appellant's intimidation and threats.
 {¶ 57} The victim testified that once appellant tackled and bound her, he stated had she accepted his original proposal (to accept $10,000 in exchange for sex), he "wouldn't have to do this." After taping the victim's hands, appellant also abstractly queried "why wouldn't you just be with me[?]" According to the victim, appellant subsequently advised: "listen if you do what I say, I'm not going to hurt you, I don't want to have to hurt you, I don't want to have to kill you. * * * I can't make this look like a rape because if it looks like rape, I'm going to go to jail because I know you'll tell the cops." Moreover, even though appellant removed the duct tape prior to the commission of the sexual acts upon which the rape convictions were premised, she was still being restrained by appellant's threats, i.e., according to the victim, appellant stated "by the grace of God you think you're going to get out of here, you're not because I have knives hid all over this apartment and you're not going to get out of here alive."
 {¶ 58} Given the facts in evidence, we can discern no other reason for appellant restraining the victim than to make it easier for him to rape her. There is no evidence that the acts of restraining and threatening the victim have any significance independent of assisting appellant in committing the rapes. While the state cites the Tenth Appellate District's opinion in State v. Henderson, 10th Dist. No. 06AP-645,2007-Ohio-382, in support of its position that a separate animus can be inferred, we believe this case is fundamentally distinguishable. *Page 22 
 {¶ 59} In Henderson, the court affirmed the trial court's decision concluding that charges of kidnapping and rape should not be merged. The facts in Henderson demonstrated that the victim was restrained by the defendant before the rape occurred and the restraint continued for a prolonged period. Id. at ¶ 16. The victim's testimony did not indicate, however, the initial restraint was accomplished for the purpose of committing the rape; rather, the evidence indicated the defendant restrained the victim because she was attempting to call 911 after the defendant struck her in the face. Id. The court continued:
 {¶ 60} "[The defendant] restrained [the victim] again when she tried to scream out the bedroom window. He tackled her and buried her face in the carpet so she could not scream. Appellant held her body down and put her arms and hands over her face for 15 to 20 minutes. These confinements were independent of his decision to commit the later act of rape and were not merely incidental to the sexual offenses. These restraints were also temporally substantial and not for a limited period only to permit sexual conduct to occur." Id.
 {¶ 61} The Henderson court concluded that the kidnapping and rape offenses were committed with a separate animus and merger was therefore inappropriate. Id.
 {¶ 62} When the evidence in the case sub judice is considered in the context of the entire episode, it is clear that appellant's purpose and motivation for restraining the victim was to compel the victim to participate in various sexual acts completely against her will. As discussed above, the evidence does not suggest appellant's restraint of the victim was significantly prolonged and does not indicate it was motivated by anything other than appellant's desire to sexually assault her. We therefore hold appellant's act *Page 23 
of restraining the victim was merely incidental to the rapes and involved no separate animus. As we find no distinct animus separating the offense of kidnapping and the rape offenses, the court should have merged the kidnapping count with the rape counts.
 {¶ 63} For the above reasons, appellant's second assignment is overruled as it pertains to the merger of the three rape counts and GSI count; however, it is sustained as it pertains to the merger of the kidnapping count.
 {¶ 64} Appellant's final assignment of error asserts:
 {¶ 65} "The trial court erred in sentencing appellant to sentence [sic] on the repeat violent offender specifications, in violation of the double jeopardy provisions of the U.S. Constit., amend. V and XIV, and Ohio Const. , art. I, [Section] 10. [sic.]"
 {¶ 66} Under his third assignment of error, appellant contends the Supreme Court of Ohio's holding in State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, acted to impermissibly "re-write" the Ohio's RVO when it severed the portions of the statute that (formerly) required judicial factfinding. Appellant's contention is not well taken.
 {¶ 67} In Foster, the Supreme Court of Ohio specifically severed the unconstitutional portions of R.C. 2929.14(D)(2) that required a sentencing court to engage in factfinding before enhancing a defendant's sentence for RVO specifications. In particular, the court stated: "R.C. 2929.14(D)(2)(b) and (D)(3)(b) are capable of being severed. After the severance judicial factfinding is not required before imposition of additional penalties for repeat violent offender and major drug offender specifications. * * *" Foster, at paragraph six of the syllabus.
 {¶ 68} In severing the foregoing unconstitutional portions of Ohio's felony sentencing code, inter alia, the court explicitly recognized, by virtue of the doctrine of *Page 24 
separation of powers, it could not "rewrite the statutes." Id. at 30. Severing the unconstitutional provisions removed certain unconstitutional procedural prerequisites for imposing felony sentence (on an RVO or otherwise). This removal was necessary to bring Ohio's felony sentencing scheme into compliance with a defendant'sSixth Amendment right to a jury trial. It was not, however, an effort to rewrite nor tantamount to rewriting Ohio's felony sentencing code. Hence, appellant's argument that the act of severing the offending provisions was a form of redrafting the statute is without merit.[5]
 {¶ 69} Appellant's final assignment of error is without merit.
 {¶ 70} For the reasons discussed in this opinion, appellant's first and third assignments of error are overruled. Appellant's second assignment of error is overruled as it relates to the merger of his rape and GSI convictions. However, it is sustained as it relates to his kidnapping conviction. Appellant's kidnapping conviction and sentence is therefore reversed and the matter is remanded to the trial court with instructions to prepare an amended sentencing entry formally recognizing the merger of the kidnapping count with appellant's rape convictions.
DIANE V. GRENDELL, P.J., concurs,
[1] Appellant, however, was not dying of cancer or ill in any way. At trial, appellant denied telling Raney he had cancer; however, Raney's friend, Tanya Bier, a fellow exotic dancer, testified appellant had also, at some point, told her he "didn't have long to live."
[2] R.C. 2905.01(A)(4) provides: "No person, by force, threat, or deception * * *, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity, as defined in [R.C.] 2907.01, with the victim against the victim's will." Pursuant to R.C. 2907.01, sexual activity "means sexual conduct or sexual contact, or both." Sexual conduct "means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and without privilege to do so, the insertion, however slight of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A). Sexual contact "means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.
[3] R.C. 2907.05(A)(1) provides: "No person shall have sexual contact with another not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he offender purposely compels the other person or one of the other persons, to submit by force or threat of force."
[4] R.C. 2907.02(A)(2) provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
[5] Although appellant suggests that the RVO statute violates his right to be free from double jeopardy, he fails to affirmatively argue this thesis. Irrespective of this App. R. 16(A)(7) violation, this court has previously rejected such a contention in State v. Crain, 11th Dist. No. 2001-L-147, 2003-Ohio-1204, at ¶ 76. *Page 25