[Cite as *State v. Burry*, 2018-Ohio-4477.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2017-L-160** |
| ROBERT BURRY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2017 CR 000036.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, *Jennifer A. McGee* and *Paul E. Kaplan*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Charles R. Grieshammer*, Lake County Public Defender, and *Vanessa R. Clapp*, Assistant Public Defender, 125 East Erie Street, Painesville, OH 44077 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Robert P. Burry, appeals his convictions for Attempted Murder, Felonious Assault, and Kidnapping as well as his post-merger sentence for Attempted Murder following a jury trial in the Lake County Court of Common Pleas. The issues before this court are whether a trial court errs by preventing a defense expert from testifying to the results of an experiment when the fact that the experiment had been conducted was not disclosed to the prosecution; whether

a prosecutor commits prosecutorial misconduct by placing a gun against his forehead during closing argument to demonstrate an issue at trial; whether convictions for Attempted Murder, Felonious Assault, and Kidnapping are not supported by sufficient evidence and/or are against the weight of the evidence where the victim's testimony at trial is at variance with her initial statements to the police and where the defendant's expert testified to the unlikelihood of a gun being loaded when it is fired twice without discharging a bullet; and whether a thirteen-year sentence for Attempted Murder with a Firearm Specification is clearly and convincingly supported by the record based on the psychological harm caused the victim and the defendant's minimization of his conduct. For the following reasons, we affirm the decision of the court below.

{¶2} On January 27, 2017, the Lake County Grand Jury indicted Burry of the following: two counts of Attempted Murder (Counts 1 and 2), felonies of the first degree in violation of R.C. 2903.02(A) and R.C. 2923.02; two counts of Felonious Assault (Counts 3 and 4), felonies of the second degree in violation of R.C. 2903.11(A)(2); Kidnapping (Count 5), a felony of the first degree in violation of R.C. 2905.01(A)(3); Domestic Violence (Count 6), a misdemeanor of the first degree in violation of R.C. 2919.25(A); Aggravated Menacing (Count 7), a misdemeanor of the first degree in violation of R.C. 2903.21; Using Weapons While Intoxicated (Count 8), a misdemeanor of the first degree in violation of R.C. 2923.15; and Resisting Arrest (Count 9), a misdemeanor of the second degree in violation of R.C. 2921.33(A). Counts 1 to 5 of the Indictment contained Firearm Specifications pursuant to R.C. 2941.145.

{¶3} On February 3, 2017, Burry was arraigned and entered a plea of "not guilty" to the charges in the Indictment.

2

**{¶4}** Between September 19 and 21, 2017, a jury trial was held. Prior to the commencement of trial, the State elected to dismiss Counts 6 to 9 of the Indictment. The following witness testimony was given at trial:

**{¶5}** Sergeant Daniel Hirz of the Willowick Police Department testified that, at about 8:24 p.m. on Christmas Eve 2016, he responded to a call at the home of Robert and Carol Burry at 299 East 293rd Street. Upon arrival, Hirz observed: "Mrs. Burry at the end of the driveway crouched down behind the cars that were parked in the street. She was crying, a bit hysterical and she was just saying he tried to shoot me twice." Hirz entered the residence with his weapon drawn.

**{¶6}** Sergeant Hirz met Burry in the hallway:

> I ordered him to the ground, I ordered to see his hands. Initially he showed me his hands and complied and was beginning to kneel down in compliance. * * * I saw he didn't have anything in his hands, I began to holster my weapon and he decided to get up and he said to shoot me, you mother and then he began to say the word fucker but since he was advancing on me I kicked him in the chest knocking him backwards which took the wind out of him. * * * [He] staggered backwards until he ran into the couch and sofa which kept him [from] falling over. Once he regained his balance Officer Sobkowich, who shortly came in the door right behind me * * * tased Mr. Burry striking him in the chest which dropped forward and on to the ground.

Thereupon, Burry was handcuffed. Sergeant Hirz noted that he was "highly intoxicated."

**{¶7}** During the subsequent search of the residence: a magazine containing one bullet was found under the couch; a nine-millimeter shell casing was found in Burry's bedroom; a firearm was found in a drawer in Burry's bedroom; and a bullet hole was found, originating in Burry's bedroom, passing through another bedroom, and exiting the house.

3

{¶8} A video taken from Sergeant Hirz' body cam was played for the jury. In the video, Hirz asks Carol if Burry fired the gun at her and she responded that there were no bullets in it. She stated he "stuck it right to my [indicating her forehead]." Carol then advised Hirz that there was a gun that did go off, apparently believing it was a different gun.

{¶9} After being subdued, Burry denied that there was a firearm and that he did "anything." Several minutes later, he admitted that a gun had gone off but he denied pointing the gun at anybody and claimed he would never hurt his wife.

{¶10} Prior to taking their written statements, Sergeant Hirz interviewed Carol and her son (Burry's stepson), Kyle Johnson, in the basement of the home. Carol recalled that Burry threatened to kill her dogs and asked if she would like to die tonight. She repeated, indicating with her hands, that the gun was pointed at her head and belly and that he pulled the trigger. She claimed, "he didn't know if there could have been a bullet in there." Kyle interrupted and said, "there was." She continued, "he didn't know."

{¶11} Officer Shaun Kovacic of the Willowick Police Department testified that he responded to the Christmas Eve call to the Burry residence and entered the home after Sergeant Hirz. After Mr. Burry was subdued, Kovacic searched his bedroom. He found a spent shell casing on the floor and a pistol in a dresser drawer. Kovacic also noted a bullet hole in the bedroom which led into another bedroom and finally through the exterior wall of the house.

{¶12} Officer Steven Sobkowich of the Willowick Police Department responded to the Christmas Eve call to the Burry residence. His testimony corroborated Sergeant

4

Hirz' version of events.  Sobkowich noted powder residue on Mr. Burry's left hand.  A video taken from Sobkowich's body cam was played for the jury.

{¶13} On the Officer Sobkowich video, Burry admits that he went to his room and loaded the Beretta and that there were two bullets in the magazine.  He claimed that when he pulled the slide the gun went off accidentally.  Burry denied that he ever pointed the gun at Carol.

{¶14} Kyle Johnson was living with his mother (Carol) and stepfather (Robert Burry) in 2016.  He testified that he, Burry, and Carol kept guns in the house.  Burry kept his guns "ready to go with a clip, a magazine filled and in the gun with the safety off" and "always close by * * * to a bed or a dresser."

{¶15} Carol and Burry's marriage had been deteriorating and the couple argued frequently.  Carol wanted a divorce and had made arrangements to move into an apartment.  Kyle would remain in the home with Burry until it could be sold.

{¶16} During the afternoon on Christmas Eve, Kyle and Carol were watching a movie while Burry was out having a couple of beers with a friend.  Burry returned home, "visibly drunk," and wanted to open gifts.  He became very angry while waiting for the movie to finish.  Burry began to badger Carol about the impending divorce while his mood swung from angry to sad.  For the first time that he could recall, Kyle heard Burry become "verbally abusive" toward Carol, calling her a "traitor" and a "piece of shit."  Kyle retired to his room as the argument continued for about ten minutes.

{¶17} Eventually, Burry went to his room and Carol watched television.  Kyle next heard the safe in Carol's room where guns were kept make a "clanging" noise.  Kyle testified: "The next sound I heard was Bob rush[ing] out of the room and then

5

immediately after that I heard my mother calling my name and screaming Kyle, help, help, call the police."

{¶18} Kyle called 911 and walked to the living room and observed the following:

> I saw Bob holding my mother down with his left hand, the Beretta in his right hand directly on her forehead. * * * She was kicking and screaming and * * * as I moved closer, she kicked, was able to kick him off of her for a moment. In that moment the gun was pointed in my direction. * * * I moved toward the stairs. As Bob saw me move towards the stairs he moved his attention back towards my mom. * * * As I was describing to the dispatcher what was going on above me * * * my mother said you shot me, Bob, how could you shoot me right in the stomach. I became really scared at that moment and a little confused because at that point I hadn't heard a shot yet. * * * I heard lots of footsteps, I heard doors slamming, * * * and then I heard a shot in the house.

Kyle remained in the basement on the phone with dispatch until the police entered the house.

{¶19} Carol Burry testified regarding the deterioration of her marriage with Burry, particularly following Burry's retirement in 2016.

{¶20} On Christmas Eve, Carol was watching a movie with Kyle while they waited for Burry to return home to open gifts. Carol noted that Burry was "very intoxicated" when he returned. As they opened gifts, he became very agitated and began saying "terrible things" and "derogatory comments" about her and the pajamas she was wearing, their dogs, and the program on television.

{¶21} As their argument escalated, Burry left the room and, as he did so, he whispered in Carol's ear, "how would you like to die tonight?" The following occurred:

> Within seconds he was on top of me and holding me down and had the gun to my head pressing up against my forehead * * * and he pulled the trigger and I started screaming and kicking him off me and trying to get away and I was yelling for Kyle's help. * * * [A]nd he came right back at me and pushed the gun dead into the

6

abdomen as he was holding me with the gun and he fired it again, he pulled the trigger. * * * I was screaming he shot me. * * * I got down lower and had a better kick and I also took my arms like to get the gun away from me and I knocked his [right] arm up, the arm that had the gun in it and that's when I saw the magazine fall out of the gun and it fell down in between the ottoman and the cushion of the couch. * * * I pushed him back and I went to the left, maneuvered around him and got up off the sofa.

{¶22} Carol fled the house through a back door in the kitchen. As she fled, she called 911. A recording of the 911 call was played for the jury. During the call, Carol told dispatch: "he tried to shoot me twice with a gun" and "he put the gun right to my head," but "he didn't have any bullets in it."[1] At trial, Carol explained:

I meant that there was no bullets [that] came out, I was hysterical, I couldn't figure out what happened. I was so confused all I kept thinking is I should be dead, I should be dead. I didn't know what happened.

{¶23} After returning to the house, Carol recovered the magazine for the police from between the couch and the ottoman.

{¶24} In a written statement made immediately after the incident, Carol wrote that Burry approached her with the gun in his right hand and the magazine in the other hand and that, at some point, he threw both the gun and the magazine to the ground. At trial she claimed these statements were not accurate. Carol testified that Burry is left-handed. She had seen Burry, at one time, put the Beretta in his dresser drawer. Generally, their guns were kept in a safe in her bedroom unloaded, but with the ammunition for the guns also kept in the safe.

{¶25} Rebecca Silverstein, a firearm examiner with the Lake County Crime Laboratory, analyzed the pistol, the magazine, and the casing recovered from the Burry

---

1. Carol repeated her belief that the gun did not have bullets in it and/or was not loaded to officers at the scene, in a written statement, and in a subsequent interview with detectives.

residence. She testified that the Beretta was operable and that the spent shell casing was fired by this Beretta. She testified the Beretta could be fired even without its magazine as long as a bullet was in the chamber.

{¶26} Silverstein described the difference between the semi-automatic Beretta being "in battery" and "out of battery." When in battery, the Beretta is ready to fire: "the slide of the pistol is completely forward and in line with the front of the frame of the firearm." But "[w]hen the pistol is out of battery that slide is slightly * * * out of alignment with the front of the frame of the firearm thus causing potentially unsafe conditions * * * if the pistol were to be discharged at that point." When out of battery, "the hammer would not make full contact with the back of the firing pin." For the Beretta Storm, the slide would have to be "approximately one eighth of an inch" out of alignment for it to be "out of battery," meaning that the hammer would fall but the gun would not fire.

{¶27} Silverstein demonstrated putting the Beretta out of battery by pushing it against her hand. When this is done, the slide and the barrel (or muzzle) are moved backwards at the same time. "[T]hrough the design of this firearm," however, "the barrel gets to a point where it stops moving with the movement of the slide so then the slide can continue moving and eject the fire[d] cartridge case." At the point at which the barrel stops moving, the hammer can still be released. If the slide is manipulated beyond this point (independently of the barrel), the trigger will become disengaged and not operate.

{¶28} Detective Gregory Spakes of the Willowick Police Department photographed the crime scene and logged the items recovered into evidence. He interviewed Carol a few days after the incident during which she stated that she saw the

8

magazine fall from the hand that was not holding the gun and that Bob ran out of the house after her and she could see a gun in his hand.

{¶29} The following witness testified on behalf of Burry:

{¶30} Emanuel Kapelsohn works as a firearm trainer and consultant for a small corporation he established, the Peregrine Corporation. Kapelsohn testified regarding the operation of a Beretta PX4 Storm (subcompact) and the effects of the firearm being out of battery. According to Kapelsohn, when the pistol is one eighth inch (or less) out of battery, i.e., when the slide is one eighth of an inch out of alignment with the muzzle, it is still operational and will fire. If the pistol is between one eighth and one quarter inch out of battery, the pistol would not fire although the hammer is released thereby producing a "click." If the pistol is more than one quarter inch out of battery, the pistol will not fire nor will the hammer be released (the gun will have a "dead trigger").

{¶31} The slide can be moved out of battery by manipulating it manually, but the same result can be had by pushing the pistol against something. In court, Kapelsohn demonstrated by pushing it against his hand and he testified that, out of court, he created a "dead trigger" by pushing the pistol against his leg and against his head.

{¶32} Regarding the possibility of the Beretta being out of battery twice during the assault on Carol, Kapelsohn stated "it's possible but it's extremely unlikely": "Either the slide wouldn't be pushed far enough back and he'd fire the shot or it would be pushed too far back and there would be no click. * * * It's a remarkable fluke twice in a row within a matter of seconds."

{¶33} Kapelsohn opined as to what he believed occurred:

> The likely reason that the gun didn't go off is that it wasn't loaded. *
> * * Mr. Burry has an unloaded Beretta pistol in his hand and the

9

magazine in his other hand that has two live rounds of ammunition in it. He puts the muzzle of the pistol to Mrs. Burry's head, pulls the trigger and the gun goes click. * * * He then puts the gun to her abdomen and pulls the trigger * * *, click again cause it's not loaded, she runs out of the house. Mr. Burry * * * puts [the magazine] into the pistol and works the slide to chamber a round of ammunition, for whatever reason I don't know but he loads the pistol and then thereafter he decides to unload the pistol so he takes the magazine out. * * * [B]y accident, on purpose, whatever * * *, he pulls the trigger maybe thinking he's unloaded the pistol but really there is a round still in the chamber, bang, that round goes off, it goes through two walls and out of the house.

{¶34} Kapelsohn further opined to a "reasonable degree of certainty" that if the pistol were pushed against someone's forehead with enough force to put it out of battery that it would leave a mark, "a bruise or abrasion or something like that."

{¶35} On September 21, 2017, the jury returned a verdict of guilty to Counts 1 (Attempted Murder), 2 (Attempted Murder), 3 (Felonious Assault), 4 (Felonious Assault), and 5 (Kidnapping) of the Indictment, all Counts including Firearm Specifications.

{¶36} On October 25, 2017, a sentencing hearing was held. Prior to sentencing, the trial court merged all Counts into Count 1 (Attempted Murder). The court ordered Mr. Burry to serve a prison term of ten years for Attempted Murder and, consecutively, three years for the Firearm Specification; advised him of mandatory post release control for a period of five years; and ordered him to pay court costs and the costs of prosecution.

{¶37} On October 27, 2017, Burry's sentence was memorialized in a Judgment Entry of Sentence.

{¶38} On November 27, 2017, Burry filed a Notice of Appeal. On appeal, Burry raises the following assignments of error:

**{¶39}** "[1.] The trial court violated the defendant-appellant's state and federal constitutional rights to fair trial, due process and confrontation when it barred a defense expert from testifying regarding a key issue, yet allowed the prosecutor to conduct a demonstration regarding the same issue during closing argument."

**{¶40}** "[2.] The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim.R. 29(A)."

**{¶41}** "[3.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."

**{¶42}** "[4.] The trial court erred by sentencing the defendant-appellant to a thirteen-year prison term."

**{¶43}** Burry raises two arguments under his first assignment of error. The first argument is that the trial court erred by sustaining the State's objection to the defense expert, Kapelsohn, testifying regarding a soft wood experiment conducted prior to trial.

**{¶44}** While testifying on redirect examination regarding the issue of whether pressing the Beretta against Carol's forehead so as to put the weapon out of battery would have left a mark, Kapelsohn was asked if he had had "an opportunity to test this weapon about whether or not it would leave a mark on let's say a piece of soft wood?" Kapelsohn answered that he did and began to explain the experiment when the State objected. The trial court sustained the objection having determined that, while Kapelsohn's expert report contained his opinion that pushing the Beretta against a person's forehead would leave a mark, the report did not disclose an experiment with a piece of wood which, apparently, was conducted after his report was turned over to the State.

11

{¶45} Under the Rules of Criminal Procedure, "[t]he defendant shall provide copies or photographs, or permit the prosecuting attorney to copy or photograph, * * * [the] [r]esults of * * * experiments or scientific tests." Crim.R. 16(H)(2).

{¶46} "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L)(1). This Rule "vests in the trial court the discretion to determine the appropriate response for failure of a party to disclose material subject to a valid discovery request," and "[r]eversible error exists only where the exercise of such authority by the trial court constitutes an abuse of discretion." *State v. Wiles*, 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1991); *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 20.

{¶47} We find no abuse of discretion in the trial court's decision to prevent the defense expert from testifying regarding the soft wood experiment. Burry offered no explanation for the failure to disclose to the State that the experiment had been conducted. The issue of whether pushing a pistol against a person's forehead or stomach so as to put it out of battery would leave a mark was disputed at trial. The probative value of conducting an experiment with soft wood as a substitute for the human body is not immediately apparent. To allow Kapelsohn to testify regarding the results of such an experiment on redirect, when the State was unaware of either the methodology or the results of the experiment would have been unfair to the prosecution.

12

**{¶48}** The case of *State v. Branham*, 104 Ohio App.3d 355, 662 N.E.2d 54 (12th Dist.1995), is comparable. In *Branham*, defense counsel had identified an expert witness in the pretrial discovery statement but did not disclose the details of an experiment "involving the shooting of arrows into a pig skull stuffed with styrofoam." *Id.* at 361. "Therefore, the trial court confined the expert's testimony to his expertise as developed through his experience and precluded testimony based upon the pig skull experiment." *Id.* The court of appeals affirmed, observing that "[t]he trial court excluded only that expert testimony concerning the pig skull experiment," while "[a]ll other testimony by the expert was permitted." *Id.* at 362. "Under the circumstances, the sanction imposed by the trial court is entirely consistent with the Criminal Rules and does not constitute an abuse of discretion." *Id.* Similarly in the present case, the trial court excluded only Kapelsohn's testimony regarding an experiment which had not been included in his expert report.[2]

**{¶49}** Burry's second argument under the first assignment of error is that the trial court, while preventing "his expert witness from testifying regarding the results of a test that was key to his defense," nevertheless permitted "the prosecut[ing] attorney to essentially testify and conduct a presentation similar to the one the trial court barred his expert witness from presenting." Appellant's brief at 15.

**{¶50}** "Where prosecutorial misconduct is alleged, the court must determine whether the remarks in closing argument were improper and, if so, whether the remarks prejudicially affected substantive rights of the defendant." *State v. Phillips*, 74 Ohio

---

2. Burry argues at length in his brief that the trial court misapplied Criminal Rule 16(K) ("[f]ailure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial."). The trial court did not cite to Rule 16(K) which does not properly apply to the present situation inasmuch as Kapelsohn did timely disclose his written report to the prosecution, albeit without mention of the soft wood experiment.

13

St.3d 72, 90, 656 N.E.2d 643 (1995). "The assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court." *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990), paragraph three of the syllabus. "Such determination will not be reversed on appeal absent an abuse of discretion." *Id.*

{¶51} During closing argument, and over the objection of defense counsel, the prosecutor demonstrated pointing the Beretta to his head to take it out of battery. He explained the demonstration to the court as follows:

> By way of argument and by way of demonstrating things that are in evidence I'm going to take that loaded pistol and I'm going to take it cocked unloaded, I'm going to press it into my forehead and create an out of battery situation and we're going to release and we'll see how long it takes to mark my forehead.

{¶52} Contrary to Burry's position, we find that the prosecutor's demonstration was not improper. There is no indication in the record that the demonstration was intended to be testimonial, i.e., by pressing the pistol against his forehead, the prosecutor was trying to convince rather than prove to the jury that the pistol could be put out of battery without leaving a mark. The demonstration was theatrical rather than evidentiary and the prosecutor anticipated that the jury would draw its own conclusions on the issue based on its own handling of the evidence.

{¶53} Before the jury, the prosecutor argued:

> Now there is a question about whether or not you press this into someone's forehead and it's going to cause some sort of injury, cause some sort of mark that's going to be obvious or visible. I'm going to do something for you because I mean really you got to make a decision how you handle the evidence. * * * But I'd like to save you from putting this thing to your own head like I'm about to do * * *. I'm not going to know if there is a mark on my head, I'm not going to know if it disappears by the time I'm done talking [to]

14

you. \* \* \* This is a .9 millimeter weapon, you'll see when you get back to the jury room it doesn't take a lot of force to put that out of battery. \* \* \* And I think when you have that weapon back there you'll find that is something because you're going to be pressing it into your head just like I did.

*Compare State v. Naples*, 94 Ohio App. 33, 114 N.E.2d 302 (7th Dist.1952), paragraph four of the syllabus ("[i]t is not misconduct resulting in prejudicial error for the prosecuting attorney in the trial of an accused for assault with intent to kill \* \* \* to refer to and demonstrate the use of a sawed-off billiard cue on the person of the prosecuting witness, there being no evidence that such billiard cue was used in the assault \* \* \*, where such remarks merely constituted the prosecutor's interpretation of the facts as he knew them").

{¶54} It is worth noting that the Beretta was repeatedly pressed against the human body to put it out of battery – by Silverstein, by Kapelsohn, and by the prosecutor[3] – during trial but never with the understanding that such demonstration constituted a scientific test or experiment with evidentiary value. During his cross examination, Kapelsohn commented that he still had a mark on his hand forty-five minutes after using his hand to put it out of battery. The prosecutor commented that his hand did not have a mark, but recognized that whether a mark is made "depends on the individual's biology \* \* \* [and] a million things that neither one of us have any business talking about with any expertise."

{¶55} Lastly, the trial court duly instructed the jury both before and after trial that the closing arguments of counsel are "designed to assist" the jury in its deliberations but are not evidence. *Pang*, 53 Ohio St.3d 186, 559 N.E.2d 1313, at paragraph four of the

---

3. The prosecutor pushed the Beretta against his hand to put it out of battery during his cross examination of Kapelsohn after Kapelsohn had made the same demonstration during direct examination.

15

syllabus ("[a] presumption always exists that the jury has followed the instructions given to it by the trial court").

{¶56} Burry also claims the prosecutor improperly held himself out as an expert by explaining that he had firearms experience from his time in the Marine Corps and that one of the reasons he was brought on the case was because of his "expertise" in handling firearms. Appellant's brief at 13.

{¶57} The context of these comments readily demonstrates that the prosecutor was not holding himself out before the jury as an expert witness. Both comments occurred during the voir dire of the jury. In one instance, the prosecutor responded to a juror's statement that his experience and knowledge came from the "U.S. Army" with "that's my same experience in the Marine Corps." In the other instance, the prosecutor mentioned his "expertise" to assure the jury that "we would handle this firearm [the Beretta] safely" and that "we're going to follow the safety things that everyone * * * is taught from the get go."[4]

{¶58} Burry's final argument under this assignment of error is that the prosecutor improperly claimed "that the defense expert was 'tricking' the jury." Appellant's brief at 14. The prosecutor was referring to Kapelsohn's demonstration of how the Beretta would not be able to release its hammer (have a "dead trigger") if it was put a quarter inch or more out of battery. On cross examination, the prosecutor had Kapelsohn admit that in order to achieve this result it was necessary for him to tilt his hand and apply

_____

4. Counsel for Burry likewise addressed the issue during voir dire: "I can't tell you that I'm an expert. I can tell you that I'm knowledgeable on the subject. I can tell you I've been trained. I can tell you I've been to the range. I can tell you I've had several hours of shooting range practice and I've done the course and I know the laws associated with the weapons and firing the weapons but are you able to kind of, can you look at me, can you look at Bob [Burry] the same way you look at Mr. Kaplan [the prosecutor]; what do you guys think? I'm seeing nods, okay."

pressure to the top portion of the slide to allow it to move independently of the barrel. If the Beretta is pushed against the hand or other hard surface perpendicularly so that the slide and barrel moved in unison, the slide would not be able to be pushed so far out of battery as to disengage the hammer. In other words, when Kapelsohn performed the demonstration he pushed the Beretta against his hand at an angle and this affected the result.

{¶59} In referring to the demonstration during closing argument, the prosecutor described the demonstration as a "trick":

> He's holding his hand trying to push at the top of the slide to create the separation so he can get the trigger to go spongy [dead] like he showed and manipulated. * * * That's the problem I had with Kapelsohn and the extent that he went to try and cup the barrel and push against the slide so he can get the trigger in the position because when you're being fair about it when you're pushing it [the slide and barrel] together like a normal person would be you're not going to get it there [past a quarter inch]. That's a trick he's trying to pull on you, don't buy it.

{¶60} The prosecutor's characterization of Kapelsohn's demonstration as a trick is within the permissible bounds for closing argument. This court has observed that "[t]here is no requirement that a prosecutor's language must be neutral in its characterizations of the evidence or defense strategy." *State v. Novak*, 11th Dist. Lake No. 2003-L-077, 2005-Ohio-563, ¶ 42 (the prosecutor described the defense strategy as a "whitewash" he was trying to "sell" the jury). In the present case, the prosecutor's reference to the demonstration as a trick was no more pejorative (or improper) than was defense counsel's comments that "the government has told [Carol] what to say from the beginning" and "from December 24th, 2016 at approximately 8:30 p.m. this woman's been told and coached what to say."

17

**{¶61}** The first assignment of error is without merit.

**{¶62}** In his second and third assignments of error, Burry argues that there was insufficient evidence to support his convictions and that his convictions were against the manifest weight of the evidence.

**{¶63}** The manifest weight of the evidence and the sufficiency of the evidence are distinct legal concepts. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44. With respect to the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶64}** Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* An appellate court considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction

18

must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶65}** To convict Burry of Attempted Murder it was necessary for the State to prove, beyond a reasonable doubt, that Burry purposely engaged in conduct that, if successful, would result in the death of another. R.C. 2903.02(A); R.C. 2923.02. To convict him of Felonious Assault, it was necessary to prove that he knowingly attempted to cause physical harm to another. R.C. 2903.11(A)(2). And to convict him of Kidnapping, it was necessary to prove that he, by force, restrained the liberty of another for the purpose of terrorizing or inflicting serious physical harm on her. R.C. 2905.01(A)(3).

**{¶66}** There is no serious contention that the State failed to present evidence sufficient to convict Burry of the charges. There was evidence that he held Carol down and fired a loaded gun at her head and at her stomach. The real issue is whether the State's evidence is credible, thus implicating the manifest weight of the evidence.

**{¶67}** Burry raises issues with Carol's credibility, noting that she did not believe that the pistol was loaded at the time of the incident, did not claim that she had been held down in her initial statements to the police, and changed her account of events as to whether Burry held the magazine in his other hand and the number of clicks she heard when he pulled the trigger. Burry impugns Carol's credibility by noting that, after he allegedly threatened her life and the lives of her dogs, she remained on the couch watching television.

**{¶68}** We find Carol's testimony to be credible, if not wholly consistent. It is evident that immediately after the assault she was confused as to what had happened.

19

She had no reason for believing that the gun was unloaded other than the fact that it did not fire. She also struggled with the fact that Burry had never been violent with her before.

{¶69} The salient aspects of Carol's testimony are corroborated by other evidence. Kyle, who never doubted the Beretta was loaded, confirmed that Burry held Carol down while pointing the gun at her. Burry suggests that Kyle has also changed his testimony to conform to the State's theory of the crime. But there is no inconsistency between Carol's and Kyle's testimony that she was held down and their initial statements to the police. That Burry held Carol down is merely an additional detail that is consonant with the fact that Carol was sitting down on a couch when Burry put the gun to her head and stomach. He would have to have been standing over her or be physically on top of her to do this.

{¶70} It is likewise significant that Carol was able to immediately locate the Beretta's magazine between the couch and ottoman, although she was unaware of the pistol's location in Burry's dresser drawer.

{¶71} Burry emphasizes his expert witness' testimony that the possibility of the Beretta being out of battery twice within seconds of the trigger being pulled is extremely unlikely and that it is more probable that it was not loaded when Burry fired. Burry's theory of events, however, is not without its incredible elements. It presupposes Burry loading the Beretta after he had fired twice at Carol for reasons unknown, chambering a round, dropping the magazine in the living room, and then moving to his bedroom where he discharged the weapon. Under this theory, there is no obvious logic or reason behind Burry's actions. It fails to account for Carol's knowledge of the magazine's

20

location (unless we assume she remained on the couch while Burry actually loaded the weapon and then waited for him to change his mind and discard the magazine). And it is inconsistent with Burry's own explanation of events from Sergeant Hirz' and Officer Subkowich's body cams.

{¶72} Both parties' experts essentially agreed that the Beretta would not discharge if it was more than an eighth of an inch out of battery and that it could be put out of battery by pressing it against a person's body. The likelihood of the weapon being put out of battery by pressing against a person's forehead and stomach is especially for the jury to decide inasmuch as the jury was able to physically handle and manipulate the weapon in addition to witnessing the experts doing so.

{¶73} On balance, we find that the greater amount of credible evidence supports Burry's convictions. The second and third assignments of error are without merit.

{¶74} In his fourth and final assignment of error, Burry contends that his thirteen-year aggregate sentence is not supported by the record and is contrary to law.

{¶75} "The court hearing an appeal [of a felony sentence] shall review the record, including the findings underlying the sentence or modification given by the sentencing court." R.C. 2953.08(G)(2). "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the record does not support the sentencing court's findings under division * * * (C)(4) of section 2929.14, or * * * [t]hat the sentence is otherwise contrary to law." R.C. 2953.08(G)(2)(a) and (b).

21

**{¶76}** Where the sentence imposed does "not require the findings that R.C. 2953.08(G) specifically addresses * * *, it is fully consistent for appellate courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court." *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 23. "That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Id.*

**{¶77}** For a first-degree felony, the possible prison terms range from three to eleven years. R.C. 2929.14(A)(1). The Firearm Specification requires "a prison term of three years" to be served "consecutively to and prior to the prison term imposed for the underlying offense." R.C. 2929.14(B)(1)(a)(ii) and (2)(d); R.C. 2941.145(A).

**{¶78}** Burry contends the trial court erred in finding that no factors under R.C. 2929.12(C) existed that made his offense less serious than conduct normally constituting the offense. Burry maintains that he showed genuine remorse as evidenced by his apology to Carol and Kyle at sentencing:

> Carol, I've been waiting ten months to tell you how truly sorry I am for any pain or suffering I put you through that night. I constantly thank God that no one was hurt and killed. There is not a moment that I don't think about that night. It haunts me constantly. I hope someday you and Kyle and Todd can find it in your heart to forgive me.

**{¶79}** The sentencing court did not find Burry's remorse genuine, or at least a mitigating factor, in light of Burry's claim to not remember pointing the gun at Carol:

> I did pick up on the fact that you remember certain aspects [of the night's events] in the presentence report as you related them to the probation officer and/or in writing and then indicate that you didn't

22

remember most things because you blacked out. So I don't know which way it is. To me it's of no significance, the likelihood is you're at some point trying to minimize what happened * * *.[5]

**{¶80}** Burry further cites as mitigating factors the fact that he worked for thirty-five years and led a law-abiding life; the stress of the impending divorce; his age (sixty-three at the time of sentencing); and his anxiety and depression. The sentencing court noted that Burry "charged Sergeant Hirz" but Burry claims that, "on the bodycam, it appears that he was requesting a 'suicide by cop'" by standing up and telling the officers to shoot him.

**{¶81}** With respect to Burry's remorse, it has been the position of this court to "defer to the trial court as to whether a defendant's remarks are indicative of genuine remorse because it is in the best position to make that determination." (Citation omitted.) *State v. Sprott*, 11th Dist. Ashtabula No. 2016-A-0066, 2017-Ohio-1508, ¶ 15. Moreover, even if Burry is deemed to be genuinely remorseful, "the trial court is not obligated * * * to give any particular weight or consideration to any sentencing factor." (Citation omitted.) *State v. Pishner*, 11th Dist. Portage No. 2017-P-0004, 2017-Ohio-8689, ¶ 20. Rather, the court has "full discretion to impose a prison sentence within the statutory range." *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, paragraph three of the syllabus; *State v. Jones*, 8th Dist. Cuyahoga Nos. 103290 and 103302, 2018-Ohio-498, ¶ 45 ("[s]ince *Marcum,* a majority of districts have * * * recognized that appellate review is deferential") (cases cited).

**{¶82}** In the present case, the sentencing court imposed a ten-year sentence, one year less than the possible maximum sentence for a first-degree felony. The court

---

5. It is worth noting that from the moment Burry was subdued by police (before the ability to recall events was an issue) he denied that he had discharged a firearm and, when this claim became untenable, claimed to have discharged the weapon accidently without ever having pointed it at Carol.

emphasized the psychological harm/"torment" suffered by Carol and Burry's responsibility for causing the situation that evening ("you knew that taking that medication and mixing it with not only alcohol but a lot of alcohol * * * was a combination that wasn't going to result in anything good"). The court recognized Burry's lack of a criminal record and several letters of support received from friends and family but concluded, ultimately, "I don't know how you get beyond the fact that other than that gun not going off because of the slide because it was out of battery [Carol] wouldn't be here and you'd be in a whole different stretch of years that I would be considering right now."

{¶83} In light of the foregoing we cannot conclude that the record does not clearly and convincingly support the sentence imposed.

{¶84} The fourth assignment of error is without merit.

{¶85} For the foregoing reasons, Burry's convictions and sentence in the Lake County Court of Common Pleas is affirmed. Costs to be taxed against the appellant.


CYNTHIA WESTCOTT RICE, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents.

24